CITY OF CINCINNATI, Appellant,

v.

BANKS et al., Appellees; Oak Hills Savings & Loan Company et al.

[Cite as *Cincinnati v. Banks* (2001), 143 Ohio App.3d 272.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–000039.

Decided Feb. 2, 2001.

274

*Fay D. Dupuis,* City Solicitor, *Geri Hernandez Geiler* and *Mark C. Vollman,* Assistant City Solicitors, for appellant.

*Manley, Burke & Lipton, Robert E. Manley* and *Matthew W. Fellerhoff,* for appellees.

SHANNON, Judge.

Plaintiff-appellant the city of Cincinnati appeals from the judgment entered upon a jury verdict awarding defendant-appellee Cheryl Banks $4,469,760 for the

city's appropriation of her property. The city advances on appeal six assignments of error that, in essence, challenge the trial court's exercise of its discretion with respect to the evidence permitted to be adduced and the comments permitted to be offered in argument before the jury. Finding no merit to any aspect of these challenges, we affirm the judgment of the trial court.

The genesis of this appeal was the city's November 1998 filing in the Hamilton County Court of Common Pleas of a petition for the appropriation, pursuant to R.C. Chapter 163. The city sought by its petition to take by eminent domain property owned by Banks for the purpose of improving Fort Washington Way, the east-west connector located to the south of Cincinnati's central business district. The city prayed in its petition for an order directing the appropriation and a determination of the property's value.

In October 1999, the matter was tried to a jury. On the issue of the property's value, Banks calculated its worth at $13,922,000 and presented the testimony of two experts, who valued the property at $6,280,000 and $10,000,000, respectively. The city countered with the testimony of three experts, who variously fixed the property's value at $735,000, $701,500, and $744,000. The jury returned a verdict awarding Banks $4,469,760, and the trial court entered judgment accordingly.

The city subsequently filed a motion seeking a remittitur, the entry of judgment notwithstanding the verdict, or a new trial. On December 29, 1999, the trial court denied the motion, and this appeal ensued. By entry dated January 31, 2000, the trial court stayed execution on its judgment pending the outcome of this appeal.

I

The city, in its first and second assignments of error, contends that the trial court abused its discretion by admitting expert opinion testimony by two defense witnesses to the fair market value of Banks's property. We find no merit to this contention.

The Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, and Section 19, Article I of the Ohio Constitution guarantee just compensation for the taking of private property for public use. In an appropriation proceeding under R.C. Chapter 163, the measure of just compensation is the fair market value of the property taken. See *Columbia Gas Transm. Corp. v. An Exclusive Natural Gas Storage Easement* (1993), 67 Ohio St.3d 463, 464, 620 N.E.2d 48, 49. The fair market value of property is the price on which a willing seller and a willing buyer would settle in a voluntary sale. The determination of the fair market value of appropriated property must be made upon consideration of "what it is worth generally for any

and all uses for which it might be suitable, including the most valuable uses to which it can reasonably and practically be adapted." *Sowers v. Schaeffer* (1951), 155 Ohio St. 454, 44 O.O. 419, 99 N.E.2d 313, paragraph three of the syllabus.

The property that the city sought to appropriate is located at the foot of the Clay Wade Bailey Bridge, which spans the Ohio River between downtown Cincinnati and Covington, Kentucky. At the time of its taking, the property consisted of a two-hundred-space paved surface parking lot and a canopied building that had served, in an earlier incarnation, as the office for a gas station. The Bankses operated on the premises a parking lot, a U–Haul rental business, a convenience store, and a lottery sales outlet.

The Bankses presented at trial expert opinion testimony to the property's fair market value by two experts. Allen Nagler was a real estate broker with fifty years of experience and a specialty in commercial real estate in downtown Cincinnati. He had, over the years, served as a consultant and expert witness for private entities and for the city in its acquisition of property by eminent domain. Nagler concluded that the fair market value of the property, as of February 13, 1999, the date of the property's taking, was $6,280,000, based upon the specialized knowledge that he had garnered from his experience in downtown real estate transactions, his observation of the property, and his consideration of market data from approximately two hundred arm's-length real estate transactions in which he had participated.

M. Robert Garfield was also a real estate broker, with forty-five years of experience and a specialty in downtown real estate, including property along the city's riverfront. Garfield estimated the property's fair market value at $10 million. In contrast to Nagler, Garfield found no comparable arm's-length transactions. He instead based his opinion on his observation of the property's "unique" location "between two half-billion dollar properties," *viz.,* the then nearly completed Paul Brown Stadium and the certain-to-be-expanded Cincinnati Convention Center; on his determination that retail or commercial development would prove to be the property's "highest and best use"; and on an "educated gut feeling" gained from forty-five years' experience in downtown real estate transactions.

The city had sought, through a pretrial motion *in limine,* to preclude testimony by Garfield to the property's fair market value. The trial court, following a hearing, "overruled" the motion. At trial, the city objected to Nagler's opinion testimony about the property's fair market value on the ground that it lacked a proper foundation. The trial court overruled the objection. The court also admitted Garfield's opinion on the property's fair market value, despite the city's objection and its subsequent motion to strike the witness's testimony on the ground that Garfield had employed an "unacceptable methodology."

We note at the outset that the rules and statutes governing procedure and evidence make no provision for a "motion *in limine*." A trial court may, however, be seen to derive its authority to consider such a motion from Evid.R. 611(A), which authorizes the court to control the presentation of evidence at trial. See *State v. Lundy* (1987), 41 Ohio App.3d 163, 165, 535 N.E.2d 664, 668. A motion *in limine* is, in essence, a pretrial request for a tentative ruling cautioning the nonmoving party to avoid "referring to or offering evidence on matters so highly prejudicial to [the] moving party that curative instructions cannot prevent [a] predispositional effect on [the] jury." Black's Law Dictionary (6 Ed.1990) 1013 (quoted in *State v. French* [1995], 72 Ohio St.3d 446, 449, 650 N.E.2d 887, 890). The trial court need not rule upon the motion, and regardless of the court's disposition of the motion, error in the ultimate admission of the challenged evidence must be preserved by objection when the matter is broached at trial. In the absence of a timely objection, any error in the admission of the evidence is waived unless it rises to the level of plain error. See *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523, paragraph three of the syllabus.

On appeal, the city contends that the opinions of Garfield and Nagler on the property's fair market value were inadmissible at trial, when they were not based upon any of the three "recognized methods of appraising real property for its fair market value" prescribed by the Uniform Standards of Professional Appraisal Practice ("USPAP"). To the contrary, neither statutory nor case law restricts expert opinion testimony on the fair market value of appropriated property to those opinions founded upon the methods prescribed by the USPAP. Rather, " 'in determining the amount of compensation, or the market value of the property taken, each case must be considered in the light of its own facts, and every element that can fairly enter into the question of value, and which an ordinarily prudent business [person] would consider before forming [his] judgment in making a purchase, should be considered.' " *Sowers, supra,* at 459, 99 N.E.2d at 317 (quoting 29 Corpus Juris Secundum 971, Section 136).

Under R.C. Chapter 163, the "assessment of compensation" is a matter for the jury. See R.C. 163.09. Evid.R. 702 and 704 permit expert opinion testimony on the ultimate issue to be decided by the trier of fact under the following conditions: First, the testimony must "relat[e] to matters beyond the knowledge or experience possessed by lay persons," *i.e.*, it must aid the trier of fact in drawing the proper inferences from the evidence; second, "the witness [must be] qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony," and third, the testimony must be "reliable." Evid.R. 702(A) through 702(C). In general, the test for reliability is whether the "testimony is based on reliable scientific, technical, or other specialized information." Evid.R. 702(C). But testimony that

"reports the result of a procedure, test, or experiment * * * is reliable only if" the procedure, test or experiment (1) is based on a theory that is either "objectively verifiable" or "validly derived from widely accepted knowledge, facts or principles," (2) is "design[ed to] * * * reliably implemen[t] the theory," and (3) "was conducted in a way that will yield an accurate result." Evid.R. 702(C)(1) through 702(C)(3). An expert must base his opinion, in whole or in major part, on "facts or data * * * perceived by him or admitted in evidence" at trial, and he must disclose "the underlying facts or data" before rendering his opinion. Evid.R. 703 and 705; see, also, *State v. Solomon* (1991), 59 Ohio St.3d 124, 570 N.E.2d 1118, syllabus (in which the Ohio Supreme Court relaxed the foundational requirement of Evid.R. 703). The decision to admit expert opinion testimony is discretionary with the trial court and will not be disturbed on appeal unless the court abuses its discretion. See *Wightman v. Consol. Rail Corp.* (1999), 86 Ohio St.3d 431, 437, 715 N.E.2d 546, 552.

Garfield and Nagler, by virtue of their "experience" with and "specialized knowledge" concerning the market for downtown real estate, must be said to have been qualified to render an expert opinion on the fair market value of Banks's property. The property's fair market value was unquestionably a matter beyond the scope of the knowledge and experience of a layperson; therefore, expert opinion testimony to the property's fair market value was helpful to the jury in assessing the compensation due Banks upon the property's appropriation. Moreover, the testimony of each expert was preceded by disclosure of, and was based upon firsthand knowledge of, the facts and data underlying his testimony. Finally, the testimony did not "repor[t] the result of a procedure, test, or experiment," but was instead based upon "specialized information" garnered from years of experience in downtown real estate, and each expert presented testimony that would permit a conclusion that that "specialized information" was "reliable."

We, therefore, hold that the admission of expert opinion testimony by Garfield and Nagler did not constitute an abuse of discretion. Accordingly, we overrule the first and second assignments of error.

## II

We address next the fourth assignment of error, in which the city challenges the denial of its motion for a new trial. Specifically, the city argues that the trial court abused the discretion conferred under Civ.R. 59(A)(1) to grant a new trial when the court had improperly admitted into evidence at trial testimony to profits from the businesses operated by Banks and her husband on the property. This challenge is untenable.

Prior to trial, the city filed a motion *in limine* seeking an order to exclude evidence concerning "profits or net operating income of the [Bankses'] business[es]." The city argued in support of its motion that the admission of evidence of lost future profits from the businesses operated on the appropriated property would "undu[ly] prejudice" the city, when such profits were "too speculative and uncertain in character" to provide a basis for evaluating the property's fair market value. The trial court, by entry, "sustained" the motion and ordered that "evidence of profits and net operating income of any business on the property in question be excluded from the trial."

Despite the court's order, and often over the city's objections, testimony concerning the nature and profitability of the business ventures pursued on Banks's property was volunteered, elicited, and admitted at trial.

During the defense's case-in-chief, the trial court sustained the city's objection to, and instructed the jury to disregard, testimony by a defense expert witness that the Bankses had "netted about $100,000 a year on lottery tickets." Yet, the court permitted, over the city's objections, testimony to the relative success of the Bankses' lottery sales outlet and testimony by Banks that the "pretty much maintenance free" building on the property had yielded a "real easy income stream * * *."

The city, in its case-in-chief, presented expert opinion testimony by certified real estate appraisers Raymond Jackson and Gary Wright and "parking expert" John Lawrence Donoghue. Jackson and Wright "appraised" Banks's property at $735,000 and $744,000, respectively, using the methods prescribed by the USPAP. Pursuant to the USPAP, the appraisers estimated the property's fair market value, first, by gathering market data; then, by analyzing the data to determine the subject property's "highest and best use"; and finally, by applying one or more of the three "traditional approaches to value," *viz.*, the "sales comparison" approach, the "cost" approach, or the "income" approach. Donoghue, who was not a certified appraiser, conducted a "feasibility study" and concluded, upon application of the "traditional income approach," that the property had a fair market value of $701,500.

Jackson testified that the objective of an appraiser in applying the highest-and-best-use analysis was to determine, "if [one were] to build today, what would be the ideal thing to build[,] * * * what [would] render an owner the highest net return." This determination, according to Wright, was to be made upon consideration of those uses that were "[legally] permissible," "physically possible," "financially feasible," and "maxim[ally] productive * * * [f]rom a profitability standpoint." Jackson and Wright each concluded that the highest and best use of Banks's property was as a surface parking lot, and Donoghue, in preparing his feasibility study, accepted that conclusion.

Then, proceeding on the assumption of the property's highest and best use as a parking lot, the appraisers estimated the property's fair market value under one or more of the three "traditional approaches to value." Jackson testified that, in using the cost approach to value improvements to the property, he gave no consideration to the "entrepreneurial profits" that might be derived from those improvements. In contrast, the income approach required an inquiry into the property's income-producing potential. Thus, Jackson, Wright and Donoghue each testified that, in employing the income approach, he, first, estimated the potential gross annual income of the property by multiplying the number of parking spaces that the property could accommodate by the estimated "income potential" of each space[1]; he then estimated the property's "net operating income" by subtracting from gross income the estimated expenses of operating the parking lot; and he, finally, capitalized the net income to arrive at an estimate of the property's value as "investment" or "income-producing" property.[2]

On cross-examination of the city's experts, the trial court alternately overruled and sustained defense counsel's inquiries into whether the opinions expressed by the city's expert witnesses were formed upon consideration of the fact that the Bankses' lottery sales outlet was the "largest" or "busiest" in the state. The court also initially sustained the city's objections to defense counsel's inquiries into whether the city's experts had considered the "sales," "revenue," or "volume" generated by the Bankses' lottery business. But the court required the experts to respond to counsel's queries when they directly targeted the experts' opinions as to the property's highest and best use.

Finally, in the Bankses' case in rebuttal, the trial court precluded testimony by defense expert Garfield to the income generated per parking space by the Bankses' parking operation. And while the court permitted the Bankses' accountant to testify, over the city's objection, that the property was "uniquely" situated for the sale of lottery tickets, the court excluded the accountant's testimony to the "lucrative" nature of the lottery business and to the property's "best use" as a lottery sales outlet.

■ In its post-trial motion, the city sought a new trial under Civ.R. 59(A)(1), 59(A)(2), 59(A)(4), 59(A)(6) and 59(A)(9). Its challenge on appeal, however, focuses on the trial court's exercise of its discretion in admitting, over objection,

---

1. Jackson's written report, which was admitted as an exhibit at trial, states that an estimate of the "income stream" may be derived from "current market data, or historic data for the property or similar properties."

2. Jackson's testimony relative to the income approach prompted an objection by defense counsel. The trial court overruled the objection following an unreported sidebar. Defense counsel then proffered as the basis for his objection the court's order limiting testimony concerning "business income" that had been prompted by the city's own motion *in limine*.

and in the face of its order on the motion *in limine,* testimony concerning the profitability of the Bankses' lottery sales operation. Civ.R. 59(A)(1) permits a court to grant a new trial on the basis of an "abuse of discretion, by which an aggrieved party was prevented from having a fair trial." The disposition of a motion for a new trial based on Civ.R. 59(A)(1) is discretionary with the trial court and will be reversed on appeal only if the record demonstrates that the court abused its discretion. See *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685, paragraph one of the syllabus.

■ The city predicates its challenge to the admissibility of evidence of lottery profits or net operating income on the "business losses" rule. See Oswald, Goodwill and Going Concern Value: Emerging Factors in the Just Compensation Equation (1991), 32 B.C.L.Rev. 283. The business-losses rule is a judicial construct that holds that the owner of appropriated property may not be compensated for the loss of future profits from any commercial enterprise on the property. See *Preston v. Stover Leslie Flying Serv., Inc.* (1963), 174 Ohio St. 441, 23 O.O.2d 100, 190 N.E.2d 446, paragraph five of the syllabus; *Sowers v. Schaeffer, supra,* at 459, 44 O.O. at 421–422, 99 N.E.2d at 317. The theory underlying the application of the rule by Ohio courts to deny compensation for lost future profits is that commercial profits "depen[d] * * * upon the acumen and skill of the one who carries on the business," *Sowers v. Schaeffer, supra,* at 459, 44 O.O. at 421, 99 N.E.2d at 317, and thus the "[l]oss of future profits * * * is too speculative and uncertain for an accurate and satisfactory measurement of the [appropriated property's] present value * * *." *Preston, supra,* paragraph five of the syllabus. The rule has, in turn, provided a basis for the exclusion from appropriation proceedings of evidence of lost future profits on the ground that such profits are not relevant to a determination of the issue of just compensation or that the admission of such evidence might confuse the jury and lead to an improper award.

■ The business-losses rule does not, however, erect an insuperable barrier to compensation of the property owner for lost future profits. Rather, the rule requires the trial court to "look to the evidence to determine whether it is of such a character as to take the determination of [lost future profits] out of the field of speculation." Thus, compensation for lost future profits may be permitted if such profits can be "proved with reasonable exactitude." *Preston, supra,* at 447, 190 N.E.2d at 451.

■ Nor does the rule, as the city would have it, compel the exclusion of any and all evidence of profits or income generated by a business operated on appropriated property. It is axiomatic that evidence that is inadmissible for one purpose may be admissible for another purpose. Thus, in *Sowers v. Schaeffer,*

*supra,* the Ohio Supreme Court acknowledged that, "[a]s a rule, profits from commercial businesses on [appropriated] premises can not be shown." The court noted, however, that an estimation of the value of appropriated property necessarily entails an inquiry into "its best and most valuable uses." The court thus held that testimony to income from the rental of summer dwellings on appropriated property was admissible "to show the kinds of businesses to which the premises [were] adaptable." *Id.* at 458–459, 44 O.O. at 421–422, 99 N.E.2d at 317.

Evidence of lost future profits has also been held to be admissible for the limited purpose of rebuttal or impeachment, provided that the jury has been properly instructed as to the evidence's limited admissibility. See *Dorsey v. Donohoo* (1992), 83 Ohio App.3d 415, 615 N.E.2d 239 (holding that testimony by the owner's expert to the value of trees on appropriated property was properly admitted to rebut or impeach testimony by the appropriating agency's expert that the trees had no value in terms of their effect on the property's market value).

Finally, evidence of business profits and income has been admitted when unique circumstances have effectively eliminated the concerns inherent in the business-losses rule's theoretical underpinnings. Notably, in *Wray v. Hart* (Aug. 13, 1992), Lawrence App. No. 91AC20, unreported, 1992 WL 208900, a case that bears striking similarities to the case before us, the Ohio Department of Transportation sought to appropriate property located at the foot of a bridge spanning the Ohio River between Ohio and West Virginia. Witnesses for the property owners testified, over the department's objections, to the business income generated by a service station and lottery sales outlet operated on the property, and they attributed the relative success of those operations to the unique location of the property, which drew automobile traffic from Ohio, West Virginia, and Kentucky. The owners also adduced expert opinion testimony from a witness who testified, over objection, that, in applying the income method of appraisal, he considered income generated by the owners' businesses to arrive at a net income figure for capitalization. The Court of Appeals for Lawrence County held that the trial court did not abuse its discretion in admitting evidence concerning the owners' business income. In so holding, the court determined that "the traditional grounds for excluding such evidence did not mandate exclusion" in this instance, when the record showed that the property's value lay in the businesses' profitability, which was, in turn, attributable to the property's unique location, "rather than any particular skill, acumen, or management [abilities] possessed by [the property's owners]." Further, the court determined that, although the owners' expert had erroneously used gross business income, evidence of net business income provides an appropriate fundament for expert appraisal testimony using the income approach, because the income approach assesses "the present worth of the future potential benefits of a property," which

"is measured by the 'net income' [that] a fully informed person is warranted in assuming that the property will produce during its remaining useful life." *Wray, supra* (citing Nichols, The Law of Eminent Domain [3 Ed.1991] 4–59, Section 4.05).

In the proceedings below, and here on appeal, the grounds advanced by the city for the exclusion of evidence of lottery profits and income were, and are, essentially those specified in Evid.R. 402 and 403(A). Evid.R. 402 provides, generally, that "relevant evidence is admissible" and "[e]vidence [that] is not relevant is not admissible." Evid.R. 403(A) mandates the exclusion of relevant evidence when "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Although the terms of Evid.R. 402 and 403(A) are mandatory, a trial court is vested with broad discretion in determining whether evidence is "relevant" or whether the adverse effects of relevant evidence "substantially outweig[h]" its probative value. A reviewing court is, therefore, limited to a determination of whether the trial court abused its discretion in admitting the disputed evidence. See *Rigby v. Lake Cty.* (1991), 58 Ohio St.3d 269, 271, 569 N.E.2d 1056, 1058 (Evid.R. 401 and 402); *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 66, 567 N.E.2d 1291, 1299 (Evid.R.403[A] ).

Evid.R. 401 defines "[r]elevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Here, as in *Wray v. Hart, supra*, the evidence adduced at trial showed that the property's value resided principally in the profitability of the commercial ventures undertaken there, and that the businesses' profitability was attributable to the property's unique location, rather than to the business acumen of its owners. Upon that evidence, the trial court might reasonably have concluded that the theoretical justifications for denying compensation for lost future profits were inapt, and that the business-losses rule should not provide a basis either for the denial of such compensation or for the exclusion of evidence. But the record reflects a fairly consistent, if not scrupulous, effort on the part of the trial court throughout the trial to exclude evidence of lottery income and profits and to convey to the jury through admonitions that such evidence should be disregarded. Moreover, before submitting the matter, the court instructed the jury as follows:

"There was testimony in the case concerning the business of the lottery sales on the property in question. You may not consider this business in arriving at the fair market value of * * * Banks'[s] property.

"In other words, gross income and profits of a business on property being appropriated are not proper measures for determining the fair market value of the property being appropriated, as in this case."

Thus, the court's evidentiary rulings, admonitions, and instructions suggest that the court considered the business-losses rule to be fully operational. Consequently, evidence of lottery income and profits, if offered in support of an award of compensation for lost future profits, was inadmissible because it was not "relevant."

Nevertheless, as the trial progressed, evidence of lottery income and profits did prove to be relevant to the computation of compensation. As we noted *supra,* the measure of the value of appropriated property is its fair market value, and the determination of fair market value must be made upon consideration of "what [the property] is worth generally for any and all uses for which it might be suitable, including the most valuable uses to which it can reasonably and practically be adapted." *Sowers v. Schaeffer, supra,* paragraph three of the syllabus. The opinions of the city's experts on the fair market value of Banks's property embodied this principle when each estimate of value proceeded from an initial determination of the property's "highest and best use." Thus, the highest and best use of Banks's property was a "fact that [was] of consequence to the determination of the action." Evidence of the lottery income and profits generated on the property tended to controvert, and thus "make * * * less probable," the conclusions of the city's experts that the property's "highest and best use" was solely as a surface parking lot and tended to "make * * * more probable" the contrary conclusion that the property's highest and best use was a mixed use that would include a lottery sales outlet. Accordingly, evidence of lottery income and profits was relevant and thereby presumptively admissible.

Moreover, Evid.R. 616, which prescribes the methods of impeachment, provides an additional basis for admissibility. To the extent that evidence of lottery income and profits was relevant to, yet directly controverted the testimony of the city's experts concerning, the property's highest and best use, the evidence provided "[f]acts contradicting [those] witness[es'] testimony." As such, the evidence was admissible for the "purpose of impeaching [those] witness[es'] testimony." Evid.R. 616(C).

Despite its relevance, evidence of lottery income and profits was subject to exclusion in the proceedings below, if "its probative value [was] substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). As we noted *supra,* the trial court was somewhat erratic in excluding evidence of lottery income and profits, but regularly admonished and ultimately instructed the jury that the owner of appropriated

property could not be compensated for lost future profits. The court's admonitions and instructions were designed to guide the jury in fashioning a proper compensation award. We must presume that the jury, in determining compensation, heeded them. See *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph four of the syllabus. Thus, the trial court might reasonably have concluded that the probative value of the disputed evidence, which was considerable, was not "substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

We, therefore, hold that the trial court, to the extent that it admitted evidence of lottery income and profits and then declined to grant a new trial on that basis, did not abuse its discretion. Accordingly, we overrule the fourth assignment of error.

## III

In its third assignment of error, the city contends that the trial court abused its discretion by admitting into evidence a defense exhibit showing downtown properties acquired by or under the threat of eminent domain. This contention is equally untenable.

During direct examination of Christopher Banks, the defense presented its Exhibit 2. The witness identified the exhibit as a map of downtown Cincinnati that depicted the vast number of downtown properties taken either by or under the threat of eminent domain. The city objected, and the witness was examined on voir dire. Based upon the witness's testimony on voir dire that he had personally researched "some," but not all, of the properties depicted, the city sought exclusion of the exhibit on the ground that it was comprised of inadmissible hearsay. The court suspended its ruling on the exhibit's admissibility until it was offered into evidence. The defense subsequently elicited from a city engineer testimony regarding various inaccuracies in the information conveyed by the exhibit. Then, at the close of the defense's case-in-chief and over the city's objection, the trial court admitted the exhibit into evidence as modified by the corrections proposed by the engineer.

In an appropriation proceeding, compensation paid for other properties taken by eminent domain cannot provide a comparable basis for valuing the property to be appropriated. Exhibit 2 did not show the compensation paid for other properties taken by eminent domain. It was, however, a portrayal of the vast extent of governmental takings in the area surrounding Banks's property. As such, the exhibit was probative of, and thus relevant to show, the dearth of arm's-length transactions involving comparable properties upon which an expert

might predicate his application of one of the "traditional" approaches to determining the fair market value of property. See Evid.R. 401.

The information conveyed by the exhibit was assembled by Christopher Banks, who attested to that fact at trial. Thus, the exhibit did not present a multiple-hearsay problem. See Evid.R. 801(C) and 805.

The information was derived, however, from out-of-court "statement[s]" that Christopher Banks gleaned either from county property records or from his communications with individuals who did not testify at trial. The information was "offered in evidence to prove the truth of the matter asserted." Therefore, the exhibit was, as the city contended, comprised of "hearsay." See Evid.R. 801(C).

Hearsay is not admissible in evidence at trial, except as provided by state or federal Constitution or by statute or rule. See Evid.R. 802. The information conveyed by Exhibit 2, to the extent that it was derived from the research of county records personally conducted by Christopher Banks, was admissible under the public-records exception to the hearsay rule. See Evid.R. 803(8). But to the extent that the information was derived from Christopher Banks's communications with individuals who did not testify at trial, it was not subject to any exception to the hearsay rule and was thus inadmissible at trial. See Evid.R. 801(C) and 802.

Error in the admission of evidence will provide a basis for reversal on appeal only upon some demonstration that its admission "affect[ed a] substantial righ[t]" or was "inconsistent with substantial justice." Civ.R. 61. Such error is harmless if it can be said that, in the absence of the error, the "trier of the facts would probably have made the same decision." *Hallworth v. Republic Steel Corp.* (1950), 153 Ohio St. 349, 41 O.O. 341, 91 N.E.2d 690, paragraph three of the syllabus.

In the proceedings below, defense expert Garfield testified that, in arriving at his opinion of the fair market value of Banks's property, he did not consider comparable sales, because the only property transfers that he had found involving what he considered to be comparable properties resulted not from arm's-length negotiations but from the government's exercise of its power of eminent domain. The defense thus presented through Garfield admissible evidence concerning the matter that it had sought to demonstrate through Exhibit 2. For that reason, we are persuaded that, even if the trial court had excluded Exhibit 2, the jury would likely have arrived at the same verdict. We, therefore, hold that the trial court's error in admitting Exhibit 2 was harmless, and we, accordingly, overrule the third assignment of error.

## IV

The city contends, in its fifth assignment of error, that the trial court abused its discretion by admitting opinion testimony by Cheryl Banks to the fair market value of her property. We find no merit to this contention.

Banks testified at trial that her property had a fair market value of $13,922,000. To arrive at her opinion of the property's fair market value, Banks separately valued the land and the building. She valued the land at "$11.44 [million]" by multiplying the property's square footage by the price per square foot paid in 1990 for real estate located three to five blocks from her property. She valued the building at "approximately $2.44 [million]" upon consideration of the "real easy income stream that came through [a] building that was really pretty much maintenance free * * *."

The city objected to Banks's testimony concerning the building's value on the ground that it was improperly based on the building's "income stream." The trial court permitted the testimony. The city also moved to strike Banks's testimony on the ground that she was not qualified to render an opinion on the property's fair market value. The trial court denied the motion.

Evid.R. 701 permits a lay witness to testify in the form of an opinion if the opinion is "rationally based on the perception of the witness" and is "helpful to a clear understanding of his testimony or the determination of a fact in issue." The Staff Note to the rule states that "[t]he rule is in accordance with Ohio law as it ha[d] developed prior to the adoption of the Rules of Evidence." Ohio courts have long recognized what has come to be known as the "owner-opinion rule." Under the owner-opinion rule, an owner of real property, by virtue of his ownership and without qualification as an expert, is competent to testify to his property's fair market value. See *Tokles & Son, Inc. v. Midwestern Indemn. Co.* (1992), 65 Ohio St.3d 621, 605 N.E.2d 936, paragraph two of the syllabus; *Smith v. Padgett* (1987), 32 Ohio St.3d 344, 347, 513 N.E.2d 737, 740. The rule is based on the presumption that "the owner of real estate * * * possess[es] sufficient acquaintance with it to estimate the value of the property, and his estimate is therefore received although his knowledge on the subject is not such as would qualify him to testify if he were not the owner." *Smith, supra*, at 347, 513 N.E.2d at 740 (citing *Morris v. Huber* [1933], 15 Ohio Law Abs. 71, 73, 1933 WL 1474); see, also, *Tokles & Son, Inc., supra*, paragraph two of the syllabus.

The city concedes that the owner-opinion rule permitted Banks to express an opinion on the fair market value of her property. The city contends, however, that the trial court abused its discretion in admitting her testimony, when her opinion of the value of the building was improperly based upon lost

future profits, and when her opinion of the value of the land was shown by cross-examination to be based on property that was not comparable.

Banks, in testifying to her approach to valuing the building, did not specify in monetary terms either the "income stream" generated by or the maintenance costs associated with her building. On the record before us, we are unable to discern how Banks translated the building's "income stream" and maintenance costs into a fair market value for the building of $2,878,000. Consequently, the record does not support the city's contention that Banks improperly based her opinion of the building's fair market value on lost future profits.

 Equally feckless is the city's contention that Banks's opinion on the land's value was subject to exclusion because it was improperly predicated on noncomparable property. The weight to be accorded the owner's opinion concerning his property's value is a matter to be determined by the trier of fact. See *Smith, supra,* at 348, 513 N.E.2d at 741 (citing *Bishop v. E. Ohio Gas Co.* [1944], 143 Ohio St. 541, 546, 28 O.O. 470, 472, 56 N.E.2d 164, 166); accord *Wurzelbacher v. Colerain Twp. Bd.* (1995), 105 Ohio App.3d 97, 100, 663 N.E.2d 713, 715. Evidence elicited on cross-examination suggesting the noncomparable nature of the property upon which Banks based her opinion might have functioned to undermine her credibility but it did not provide a basis for the exclusion of her opinion.

We hold that the trial court properly permitted Banks to offer opinion testimony concerning the value of her property, leaving the jury free to accord whatever weight it wished to her opinion. Therefore, we overrule the fifth assignment of error.

## V

In its sixth and final assignment of error, the city contends that the trial court abused its discretion by permitting defense counsel, in closing argument, to refer to the business income generated by Banks's property and to disparage the integrity of the city's experts. We disagree.

Defense counsel opened his closing argument with the following statement:

"As I was sitting through this trial, I was impressed by the great emphasis placed by the city on the notion of a member of the appraisal institute.

"There are jokes about what those initials mean—MAI—but I won't get into that. But from what I saw in this case, MAI seems to be a systematic approach, but it systematically seems to hide the reality of this case * * * the so-called MAI systematic approach seems to hide the common sense of the situation."

The city offered no objection to these remarks.

Counsel then proceeded to a discussion of the position taken by each of the city's expert witnesses that a surface parking lot represented the property's highest and best use. In the course of this discussion, counsel directed the jury's attention to testimony concerning the "economic productivity" of the businesses that the Bankses had operated on the property and the property's status as the "top lottery sales outlet [or] * * * location in the state." The trial court overruled the city's objection to these and subsequent references by counsel to the property's "economic productivity."

Continuing in that vein, and in the context of commenting upon the city's challenges at trial to the educational qualifications of the defense's experts, counsel offered the following remarks relative to testimony elicited on cross-examination of the city's experts that revealed similarities between the experts' reports, which, counsel suggested, were more than merely coincidental:

"You know, it's a strange thing, even with their college degrees and their MAI designations, both Jackson and Wright made the same mistake.

"* * *

"Now how could two college-educated MAIs come up with exactly the same wrong address for a piece of real estate, unless there was some kind of special collaboration between them?

"Maybe they were sharing information; maybe they got the information from the city. No one will know. * * *

"They both made the same assumption, highest and best use parking, and they both chose to ignore the actual use, which was a mixture of compatible uses that included, among other things, parking.

"Mr. Donoghue didn't even have an opinion about highest and best use. He just accepted what Jackson and Wright told him. * * * all three of them used the wrong rates for the spaces * * *. They all made assumptions about vacancy rates, and the facts are there were no vacancies here. There was a waiting list, yet, they're asking that you, ladies and gentlemen, ignore common sense, including the common sense that people pay money for the best lottery location in the State of Ohio."

The city again offered no objection, either to these remarks or to defense counsel's subsequent statement that, "unlike the city's appraisers, who were collaborating well enough to make the same mistakes in the same way, there was no indication, no fact from which one can infer collaboration between [defense experts] Nagler and Garfield."

Finally, on rebuttal to the city's closing argument, and again without objection by the city, counsel remarked as follows:

"I do think that Mr. Wright and Jackson are qualified to render opinions, * * * [b]ut, as I said earlier, there's a joke about MAIs, and frankly this case illustrates that MAI stands for Made As Instructed."

A trial court must afford counsel "[g]reat latitude * * * in the presentation of closing argument[s] to the jury." *Pang v. Minch, supra,* paragraph two of the syllabus. Improprieties in closing argument will not provide a basis for reversal on appeal, unless the improprieties were met with timely objections or can be said to have constituted a "gros[s] and persisten[t] abuse [of counsel's] privilege." *Snyder v. Stanford* (1968), 15 Ohio St.2d 31, 44 O.O.2d 18, 238 N.E.2d 563, paragraph one of the syllabus; accord *Norwood v. Forest Converting Co.* (1984), 16 Ohio App.3d 411, 16 OBR 481, 476 N.E.2d 695. "The assessment of whether the permissible bounds of closing argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial court," and the trial court's assessment will not be disturbed on appeal, unless it is shown to constitute an abuse of discretion. *Pang, supra,* paragraph three of the syllabus.

The city preserved with timely objections its appellate challenge to the references by defense counsel in his closing argument to the subject property's "economic productivity." But, as we determined *supra,* testimony to that effect was admissible and was properly admitted in the proceedings below on the material issue of the property's highest and best use. Offered in that context, defense counsel's comments were appropriate.

The city offered no objection to the various remarks of defense counsel in closing argument that, the city now asserts, disparaged the integrity of its experts. We conclude, for the following reasons, that the city failed to preserve for appeal its challenge to counsel's allegedly disparaging remarks.

The challenged remarks were made during defense counsel's summation at the close of a trial in which the sole issue was the fair market value of the property to be appropriated. The trial disclosed a vast difference between the value estimates of the city's experts and the value estimates of the defense experts. That difference might reasonably be traced to the conclusions drawn by the respective experts regarding the property's highest and best use. During the trial, through direct and cross-examination of witnesses, each party sought to probe the reasons for the experts' varying conclusions regarding the property's highest and best use. The city did so by questioning the qualifications of the defense's experts, and the defense did so by questioning the objectivity of the city's experts. In so doing, each party employed a legitimate approach to challenging the credibility of expert opinion testimony. See Evid.R. 702 and 616(A). Thus, with one possible exception, the allegedly disparaging remarks of counsel in closing argument,

when viewed in the context in which they were offered, constituted fair comment on the evidence adduced at trial.

With his allusion in his closing argument to the "jok[e] about what those initials [MAI] mean" and his delivery on rebuttal of the punch line "Made As Instructed," defense counsel might well have crossed the line between fair and disparaging comment. But that one remark can hardly be characterized as a "gros[s] and persisten[t] abuse [of counsel's] privilege."

We, therefore, hold that the trial court, in the latitude that it afforded defense counsel in closing argument, did not abuse its discretion. Accordingly, we overrule the sixth and final assignment of error and affirm the judgment of the trial court.

*Judgment affirmed.*

GORMAN, P.J., and PAINTER, J., concur.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.