CITY OF NORWOOD, Appellee and Cross–Appellant,

v.

BURTON et al., Appellants and Cross–Appellees, et al.

[Cite as *Norwood v. Burton,* 164 Ohio App.3d 136, 2005-Ohio-5720.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–050065 and C–050070.

Decided Oct. 28, 2005.

Timothy M. Burke, Gary E. Powell, Daniel J. McCarthy, and Manley Burke; and Rick G. Gibson, City of Norwood Law Director, and Theodore E. Kiser, Assistant Law Director, for appellee and cross-appellant.

Katz, Teller, Brant & Hild and James F. McCarthy III, for appellants and cross-appellees.

MARK P. PAINTER, Judge.

{¶ 1} Plaintiff/appellee and cross-appellant, the city of Norwood, appropriated the property of defendants/appellants and cross-appellees, Matthew F. Burton and Sanae Ichikawa Burton. A compensation trial was held to determine the amount to be awarded to the Burtons for the taking.

{¶ 2} The original appeal in this case challenged the taking of the property. The trial court's judgment in the original appeal is affirmed on the authority of *Norwood v. Horney,* 161 Ohio App.3d 316, 2005-Ohio-2448, 830 N.E.2d 381, appeal accepted for review, 106 Ohio St.3d 1524, 2005-Ohio-5223, 835 N.E.2d 375.

{¶ 3} In this cross-appeal by Norwood, the sole issue is whether the trial court improperly allowed the Burtons to present expert testimony from R. James Claus, Ph.D. We conclude that Claus's testimony was properly allowed.

## I. Compensation Trial

{¶ 4} The Burtons bought the property at 2666 Edmondson Road in Norwood, Ohio, in November 2000 for $129,900. At the time they bought it, there was a single-family residence on the property. Sanae Burton had operated various Kumon Learning Centers since 1990 and envisioned using the Edmondson property for a new center. Upon purchasing the property, the Burtons remodeled the house and obtained permission from the city of Norwood to operate a business on the premises. Mrs. Burton then began operating a Kumon Learning Center there two days a week.

{¶ 5} In the time that the Burtons owned the property, developers in Norwood opened Rookwood Commons, a mall containing 48 shops and restaurants. The mall was across the street from the Burtons. In fact, cars waiting at a traffic light to exit from the Rookwood facility looked directly at the Burtons' property. By all accounts, the presence of Rookwood increased the value of the Burtons' property.

{¶ 6} At the compensation trial, three expert witnesses testified, two presented by the Burtons and one by Norwood. The Burtons first presented M. Robert Garfield, a long-time appraiser in the Cincinnati area. Garfield testified that the value of any property was in its location and that the most valuable component of the Burtons' property was its location directly across from the entrance to Rookwood. Garfield testified that there were no comparable properties to the Burtons', given its unique placement directly opposite the shopping mall.

{¶ 7} Garfield further testified that he did not do an appraisal of the Burtons' property. He explained that because there were no comparable properties and because the Burtons' property was not on the open market, but instead being taken through appropriation, an accurate appraisal was not possible. Garfield testified that based on his knowledge and experience selling, purchasing, and valuing real estate in the Cincinnati area, he believed the Burtons' property was worth at least $600,000.

{¶ 8} The Burtons' other expert witness was Dr. R. James Claus, an expert on signage who testified about the value of the visibility component of the Burtons' property. In a motion in limine, Norwood claimed that Claus was not qualified to be an expert witness. Norwood argued that Claus was not familiar with property values in Ohio and that he did not follow his own published valuation method. The trial court conducted a voir dire of Claus and permitted him to testify as an expert.

{¶ 9} Claus testified that he had a Ph.D. from the University of California at Berkeley and that he had researched and consulted for many years on the visibility component of storefronts and signage. Claus emphasized that any reasonably prudent buyer of commercial real estate would take into consideration the visibility component of a piece of property. He explained that he had developed a method of calculating the value of the visibility component of a property, or storefront, based on the number of exposures at the site. According to Claus's method of valuation, the visibility component of a property was valued at the cost to replace those exposures.

{¶ 10} Claus testified that he had published numerous books and articles on the subject of signage and visibility. Claus said that his publications, which included his method and formula for valuing visibility, had been subjected to peer review. Claus explained that he had worked with the American Society of Real Estate

Appraisers and the Appraisal Subcommittee on the first edition of his book "The Value of Signs." He said that a number of changes had been made to the work and that the book was then in its third edition. Claus testified that his method had been accepted by the Small Business Administration and that he had used it in consultations with many developers to select sites for development.

{¶ 11} In his testimony concerning the visibility component of the Burtons' property, Claus noted that Rookwood Commons was a lifestyle mall, which is a type of shopping center that provides visibility and immediate accessibility to a variety of storefronts. Claus stated that only about 60 lifestyle malls existed and that they had been very successful.

{¶ 12} Claus then explained that to measure exposures to the Burtons' property, he used traffic counts for Edmondson Road. With stipulated data from a certified transportation engineer, Claus obtained a daily traffic count in front of the Burtons' property. Though he had data from the Traffic Audit Bureau to estimate the average number of people in each car passing the site, which would have increased the number of exposures, Claus testified that he chose to make a conservative estimate and did not use that data in his calculations.

{¶ 13} After determining the approximate number of monthly exposures based on the traffic counts, Claus testified that the next step was to determine the cost to replace the same number of exposures.

{¶ 14} Claus divided the number of monthly exposures by 1000 to correlate with the common unit of cost-per-thousand exposures used in advertising. Using local newspaper advertising rates, he calculated that the Burtons would need approximately $500,000 to provide an annual $60,000 in advertising to get equivalent exposures for their business. That is, Claus testified that the visibility component of the Burtons' property was conservatively valued at $500,000.

{¶ 15} Upon cross-examination, Claus admitted that he would not hold himself out as a property expert in Ohio or Cincinnati. But Claus explained that the unique and profitable nature of the lifestyle mall made the location of the Burtons' property incomparable to other local residences converted into businesses. Claus stated that an appraisal based on other nearby property sales would have been a serious mistake, similar to "suggesting a house at the entrance to Disneyland is a house equivalent to anything else in Anaheim."

{¶ 16} Claus further testified that, similar to Garfield's opinion, a formal appraisal was not possible. Because the Burtons' property was taken by appropriation, Claus believed it would be impossible to ascertain a true market value equivalent to an arm's-length transaction.

{¶ 17} Claus also noted that he was asked to make an evaluation of the value of the visibility component of the property, not to make a formal appraisal of the

property value. He stated that because he had not done a formal appraisal, his work did not comply with the uniform standards of professional appraisal practice ("USPAP"). But Claus testified, "I don't think this is a fit case to use a USPAP appraisal." Finally, when asked if he had ever testified in court using his method for valuation of visibility, Claus answered that he had.

{¶ 18} The city of Norwood presented the expert testimony of Raymond A. Jackson, a real-estate appraiser in the Cincinnati area for over 30 years. Jackson completed a written appraisal in compliance with USPAP. Jackson explained that such an appraisal involved three approaches to valuation: the cost approach, the income approach, and the market approach.

{¶ 19} Using the cost approach, Jackson estimated the value of the Burtons' property to be $192,000. Using the market approach, Jackson testified that he found nine comparable sales and, based on those sales, concluded that the Burtons' property would sell for $200,000. Jackson stated that he did not use the income approach because most of the comparable properties were owner-occupied and did not generate income. Jackson testified that despite the limited data and the lack of a valuation from the income approach, his appraisal was still a complete appraisal.

{¶ 20} Jackson concluded that he gave "sole weight" to the market approach and opined that the value of the Burtons' property was $200,000.

{¶ 21} The jury awarded the Burtons $500,000 for their property.

## II. Expert Witness

{¶ 22} In its single assignment of error, Norwood argues that the trial court erred when it allowed Claus to testify as an expert witness.

{¶ 23} A witness may testify as an expert if (1) the witness's testimony either relates to matters beyond the knowledge or experience possessed by laypersons or dispels a misconception common among laypersons, (2) the witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony, and (3) the witness's testimony is based on reliable scientific, technical, or other specialized information.[1]

{¶ 24} While this rule permits expert testimony, a threshold determination must first be made under Evid.R. 104(A) concerning the qualifications of the witness.[2] The decision whether to admit expert testimony is discretionary with

---

1. Evid.R. 702.

2. See *Scott v. Yates* (1994), 71 Ohio St.3d 219, 221, 643 N.E.2d 105

the trial court and will not be disturbed on appeal unless the trial court has abused its discretion.[3]

{¶ 25} When a party challenges an expert witness's qualifications, the preferred procedure is for the trial court to conduct a voir dire solely on that witness's training and experience.[4] That is what the trial court did in this case.

{¶ 26} The voir dire revealed that Claus had a Ph.D. from the University of California at Berkeley in urban-real-estate finance and analysis, urban geography, and urban planning and development. After graduating, he worked on drafting sign codes in Canada with the Ministry of Transportation. He later similarly worked in San Diego, drafting sign codes and analyzing the effects of signs. Claus also began researching and consulting on the issue of the visibility component of storefronts and signage.

{¶ 27} Realizing that signs and signage provided value to property owners, Claus extended his research to finding a way to calculate the worth of the visibility component of property. Claus testified that his method for calculating the value of the visibility component had been subjected to extensive peer review and had been accepted by the Small Business Administration. Claus testified that he had used his method in his work with McDonald's, Burger King, Best Buy, and many others, in helping them to select sites for development. Furthermore, Claus stated that he had previously testified in court using his method.

{¶ 28} Upon cross-examination during voir dire, Claus admitted that, due to a lack of data, his valuation of the visibility component of the Burtons' property was based only on the cost of replacement of exposures. Claus explained that when working with bigger clients, such as McDonald's or Best Buy, he was provided with much more data and could more easily provide a valuation based also on market comparison. Nonetheless, Claus insisted that he was comfortable giving his opinion based on the available data.

{¶ 29} Norwood attacks Claus's qualifications on two fronts. First, it argues that Claus had no knowledge of real-estate values in Norwood or Ohio.

{¶ 30} The Burtons do not dispute the point. Claus himself admitted that he would not hold himself out as a property expert in Ohio. But Claus testified in voir dire that some of the commercial aspects of valuing the Burtons' property, such as the visibility component, were not dependent on just the Ohio market, but a national market. Claus explained that the Burtons' property was in the "zone

---

3. Id.

4. See *State v. Hall* (Aug. 4, 2000), 6th Dist. No. E–98–088, 2000 WL 1061875.

of influence" of Rookwood and that he had knowledge about the national market regarding lifestyle malls.

{¶ 31} Furthermore, Claus testified that Norwood's expert witness, Jackson, had made "a total fundamental mistake" in his appraisal of the property by using local properties as comparables. Said Claus, "He has not looked at what he's appraising. These grounds are being purchased to put in either a power mall or a mall similar to Rookwood. And to suggest that you go out and look at neighborhood areas where these properties are clearly now under the influence of benefiting from that mall is as serious a mistake as suggesting a house at the entry of Disneyland is a house equivalent to anything else in Anaheim."

{¶ 32} We conclude that Claus's expertise in the value of a visibility component to commercial property, especially one located directly opposite a lifestyle mall, was relevant. Given his opinion that other local properties could not be used as market comparisons, Claus's general unfamiliarity with local land values did not take away from his expertise and opinion. We conclude that the trial court properly allowed Claus to testify as an expert witness despite his general unfamiliarity with local land values.

{¶ 33} Norwood next asserts that Claus's method for calculating the value of the visibility component of the Burtons' property was not reliable, as required under Evid.R. 702(C). The rule states that the expert witness's testimony must be "based on reliable scientific, technical, or other specialized information." [5] It continues, "To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply: (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles; (2) The design of the procedure, test, or experiment reliably implements the theory; (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result." [6]

{¶ 34} The voir dire and testimony by Claus clearly demonstrated that Claus's method had been extensively reviewed by others in relevant fields of study and practice and that it had been adopted and accepted by them.

{¶ 35} To the extent that Claus did not perform a full appraisal of the Burtons' property, we note first that Claus was not retained to perform a formal appraisal. He was asked to calculate the value of only the visibility component of the property. Having arrived at his opinion of the visibility component, Claus relied

---

5. Evid.R. 702(C).

6. Id.

on other opinions of the value of the land and the existing structure on the property to give a complete value for the property.

{¶ 36} Second, we note that Garfield and even Jackson, Norwood's expert, ultimately relied on just a single method of valuation to reach their opinions on the value of the property. Garfield testified that because there were no comparable properties and because the Burtons' property was being taken through appropriation, an accurate appraisal was not possible. And Jackson, though he found nine "comparable" properties, admitted that those properties could not be used to conduct an income-approach valuation because they were owner-occupied, unlike the Burtons' property. Jackson also testified that he eventually gave "sole weight" to the market approach in reaching his opinion of the property's value.

{¶ 37} We conclude that Claus based his opinion on the limited data that was available because of the unique set of facts, just as the other two expert witnesses did. We have previously held that "neither statutory nor case law restricts expert opinion testimony on the fair market value of appropriated property to those opinions founded upon the methods prescribed by the USPAP. Rather, 'in determining the amount of compensation, or the market value of the property taken, each case must be considered in the light of its own facts, and every element that can fairly enter into the question of value, and which an ordinarily prudent business [person] would consider before forming [his] judgment in making a purchase, should be considered.'"[7]

{¶ 38} Claus's testimony was based on a peer-reviewed method that used the available data. The record does not support Norwood's claim that Claus's method was not reliable. Therefore, we conclude that the trial court did not abuse its discretion when it allowed Dr. Claus to testify as an expert witness.

{¶ 39} Accordingly, we overrule Norwood's assignment of error and affirm the trial court's judgment.

Judgment affirmed.

HILDEBRANDT, P.J., and SUNDERMANN, J., concur.

---

7. See *Cincinnati v. Banks* (2001), 143 Ohio App.3d 272, 281, 757 N.E.2d 1205, quoting *Sowers v. Schaeffer* (1951), 155 Ohio St. 454, 459, 44 O.O. 419, 99 N.E.2d 313.