[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
[1] The appeals have sua sponte been consolidated under the case number C-000656.
 OPINION.
In 1998, seven separate complaints were filed in the court of common pleas against defendants Dr. David Howard, an ophthalmologist, and his employer, Tri-State Eye Care Service ("Tri-State"). The seven complaints named as plaintiffs Linda Nickel, Ruth Hughes, Joyce Himmelblau, Ruth Siuda, George Bell, Nettie Peters, Mary Sue Prine, Rita Lawson, Charles Venable, Lora Maxwell, and Sylvia Thomas,[2] all of whom were Howard's former patients. They asserted similar claims for medical negligence, negligence, lack of informed consent, fraud, conspiracy to defraud, agency, battery, and punitive damages resulting from Howard's care in performing or recommending surgery for glaucoma and/or cataracts. Oscar Siuda, Sallie Bell, Jimmie Peters, John Prine, William Thomas, Joyce Venable, and David Himmelblau filed derivative claims for loss of consortium. In response to the complaints, Howard and Tri-State filed the same four counterclaims against each plaintiff, including slander perse, libel, loss of business, and intentional infliction of emotional distress.
On April 14, 1999, the seven cases were consolidated under the case number A-9802378. Howard and Tri-State then filed a motion for separate trials, which was denied on January 24, 2000.
In November 1999, the plaintiffs filed a joint motion for summary judgment on Howard's and Tri-State's counterclaims. In turn, Howard and Tri-State moved separately for summary judgment against Ruth and Oscar Siuda, Charles and Joyce Venable, Linda Nickle, George and Sallie Bell, Sylvia Thomas, Lora Maxwell, Rita Lawson, Joyce and David Himmelblau, Mary Sue and John Prine, and Ruth Hughes. A motion for summary judgment was not filed against Nettie and Jimmie Peters. Following a hearing on the motions, the trial court granted summary judgment to all of the plaintiffs, presumably including Nettie and Jimmie Peters, on the four counterclaims asserted by Howard and Tri-State, but the court denied summary judgment to Howard and Tri-State on the claims asserted by the plaintiffs.
A jury trial commenced in February 2000, and one month later, on March 3, the jury returned verdicts in favor of (1) Ruth Siuda for medical negligence; (2) Oscar Siuda for loss of consortium; (3) Ruth Hughes for medical negligence, failure to obtain informed consent, and malicious or fraudulent acts by Howard that were ratified by Tri-State; and (4) Lora Maxwell for medical negligence and malicious or fraudulent acts by Howard that were ratified by Tri-State. Ruth Hughes was awarded $200,000 in compensatory damages and $500,000 in punitive damages against Howard, and $250,000 in punitive damages against Tri-State. Lora Maxwell was awarded $250,000 in compensatory damages and $500,000 in punitive damages against Howard, and $250,000 in punitive damages against Tri-State. Ruth Siuda was awarded $275,000 in compensatory damages, and her husband received $75,000 for his loss-of-consortium claim. The verdicts also granted attorney fees, costs, and prejudgment interest to the prevailing plaintiffs. Following a hearing, the trial court awarded the prevailing plaintiffs $920,000 in attorney fees, $10,237.05 in costs, and prejudgment interest at the rate of ten percent per annum.
George Bell, Sallie Bell, Joyce Himmelblau, David Himmelblau, Rita Lawson, Linda Nickle, Nettie Peters, Jimmie Peters, Mary Sue Prine, John Prine, Sylvia Thomas, William Thomas, Charles Venable, and Joyce Venable filed a motion for judgment notwithstanding the verdict ("jnov") or, alternatively, for new trial, which the trial court denied.[3] Howard and Tri-State also filed a motion for jnov and a motion for new trial against the Ruth and Oscar Siuda, Ruth Hughes, and Lora Maxwell, which the trial court denied.
Howard and Tri-State have appealed, contesting the order granting consolidation, the entry denying their motion for reconsideration of consolidation, the final judgment entry, the entry approving counsel's application for attorney fees, and the entry overruling their motions for jnov and a new trial. George and Sallie Bell, Joyce and David Himmelblau, Rita and Kenneth Lawson, Linda Nickle, Nettie and Jimmie Peters, Mary Sue and John Prine, Sylvia and William Thomas, and Charles and Joyce Venable have filed a cross-appeal against Howard and Tri-State. Despite the fact that the trial court entered a judgment against Kenneth Lawson and that he has been named as a party on the notice of cross-appeal, the record is devoid of any evidence that Kenneth Lawson had served notice of a loss-of-consortium claim against Howard or Tri-State or that he had moved to intervene in this action. On the state of this record, we do not consider the cross-appeal to include Kenneth Lawson. The appeal and the cross-appeal have been consolidated by this court.
Preliminarily, we note that Howard and Tri-State did not specify all of the parties or the case numbers in their notice of appeal; rather the parties were referred to as "Oscar Siuda, et al," and the case numbers were identified as those belonging to the prevailing parties. In the notice of cross-appeal, the nonprevailing plaintiffs used the same heading provided by Howard and Tri-State in their notice of appeal.
The Ohio Supreme Court has held that inclusion of the designation "et al." in the notice of appeal, without specifically naming a party, constitutes sufficient compliance with App.R. 3(A) so as to vest jurisdiction in the court of appeals over the unspecified appellants.[4]
This is so because the only jurisdictional requirement for a valid appeal is the timely filing of the notice of appeal.[5] Accordingly, when an appellate court is confronted with a notice of appeal that is arguably deficient for some reason other than timeliness, the court is vested with the discretion to determine whether sanctions, such as dismissal, are warranted.[6] The purpose of the notice of appeal is to apprise the opposing parties of the taking of an appeal;[7] if this is done without the potential for reasonable misunderstanding, the purpose of the notice of appeal has been accomplished.
While the omissions in this notice of appeal could have resulted in a failure to notify plaintiffs Linda Nickle, Joyce and David Himmelblau, George and Sallie Bell, and Sylvia and William Thomas of the appeal against them, we hold that there has been no prejudice: they were obviously aware of the appeal because they filed a timely cross-appeal with the other non-prevailing plaintiffs. Given that, we are able to consider those assignments of error that relate to them. For the purposes of our review, we note that the parties have stipulated that the record has been supplemented after oral arguments to include all the findings and entries involving Linda Nickel, Joyce and David Himmelblau, George and Sallie Bell, and Sylvia and William Thomas. We now turn to the direct appeal filed by Howard and Tri-State.
The first issue presented for review is whether the trial court erred in granting the motion to consolidate. Civ.R. 42(A) permits, in actions involving a common question of law or fact, the trial court to consolidate some or all the issues in the actions after a hearing. The decision whether to consolidate cases is within the discretion of the trial court, and we will not reverse its decision absent an abuse of discretion.[8] An abuse of discretion has been defined as more than an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable.[9] When considering consolidation, a trial court must determine if there is sufficient commonality of issues and parties to warrant consolidating the cases.[10]
Further, the court should consider whether consolidation would save time and resources.[11]
Howard and Tri-State maintain that the trial court abused its discretion when granting consolidation because there was not a sufficient commonality of issues, and because there was a danger of jury confusion and prejudice. We do not agree.
All of the cases consolidated by the trial court concerned an attempt to hold Howard liable for his treatment and care of the plaintiffs when he recommended eye surgery, in particular cataract, glaucoma, or YAG surgery, and to hold Howard's employer, Tri-State, liable for the ratification of Howard's acts. All of the cases contained the same defendants, set forth the same legal theories, and would call upon similar expert testimony. Because common issues of law and fact existed, judicial economy was served by consolidation. Moreover, given the verdicts, there was no evident confusion by the jury. The jury was clearly able to handle the voluminous evidence and to resolve the cases individually. Accordingly, we hold that the trial court did not abuse its discretion in granting consolidation, and we overrule the first assignment of error.
The second issue for review presented by Howard and Tri-State is whether the trial court erred in admitting learned treatises in violation of Evid.R. 803, and whether the trial court erred in admitting hearsay and double hearsay in violation of Evid.R. 802.
We first address the challenge to the introduction of learned treatises. Howard and Tri-State maintain that Dr. Robert Osher, a doctor specializing in the areas of glaucoma and cataracts, impermissibly referred to learned treatises while discussing whether YAG surgeries had become outdated since the introduction of new lenses. They argue that the testimony was prejudicial because it cast doubt on Howard's decision to perform YAG surgery on his patients, particularly Ruth Hughes.
Unlike the Federal Rules of Evidence, the Ohio Rules of Evidence do not incorporate a learned-treatise exception to the hearsay rules.[12] The appropriate use of a learned treatise in Ohio is limited to impeaching the credibility of an expert who has relied upon the treatise or acknowledged it as an authority, or to demonstrating that an expert is either unaware of the text or unfamiliar with its contents.[13] References to studies by other experts in a particular field, however, do not automatically make the expert's testimony tainted by a learned treatise. It is well established that experts derive much of their expertise from reading or studying the written works of others in their field; therefore, the mere acknowledgment of those studies does not necessarily bring into play the learned-treatise barrier.[14]
On direct examination in this case, Dr. Osher explained how, in his opinion, the use of a new, lighter and more versatile lens implant for cataract surgeries diminished the need for most follow-up YAG surgeries performed on some patients who had undergone cataract surgery. While Dr. Osher referred to material that he had read in several sources, including the Referee Journal of Ophthalmology and a local American Academy newspaper, to support his conclusion that YAG surgery had fallen out of use in the medical community, Dr. Osher also testified that he had used the new lens implant, thereby suggesting that, in his experience, it had reduced the need for YAG surgeries. Because the studies utilized by Dr. Osher provided only a partial basis for his knowledge about the reduction in YAG surgeries since the introduction of the new lens implant, we cannot say that his testimony brought into play the learned-treatise barrier.
Howard and Tri-State also maintain that it was impermissible and highly prejudicial for Dr. Osher to relay hearsay testimony in violation of Evid.R. 802. These instances involved the following: (1) Dr. Osher's testimony about his conversation with Stephen Hill, a local television reporter who had aired an investigation relating to Howard's medical practices; (2) Dr. Osher's testimony about a letter that he had written to another doctor about Ruth Siuda; and (3) Dr. Osher's testimony about parts of Ruth Hughes's medical record.
Although defense counsel generally objected to what Dr. Osher said, the manner in which he had said it, and the way that he was expressing his opinion, no objections were made at the time that the alleged errors occurred. Moreover, the purported objections made at the end of Dr. Osher's testimony were so vague that they could have related to any one of many violations, including, but not limited to, issues of foundation requirements, expert-opinion requirements, or relevancy. Evid.R. 103(A)(1) requires a party to timely object to the admission of evidence and to state the specific ground of the objection if it is not otherwise apparent from the context of the testimony in order to preserve an error for appellate review. By failing to timely raise specific objections to these instances of hearsay violations, Tri-State and Howard denied the trial court the opportunity to effectively identify and correct the alleged errors.
When a party fails to so object, all but plain error is waived.[15]
"In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself."[16] We conclude that no such exceptional circumstances exist in this case, and we decline to label as plainly erroneous the statements that were not met with appropriate objections.
Tri-State and Howard did, however, raise timely objections before Dr. Osher summarized information contained in Dr. Aziz's deposition, and when Hill testified about his investigation methods for the television report.
Trial courts normally have broad discretion in admitting evidence, but Evid.R. 802 provides that hearsay is inadmissible unless an exception found in Evid.R. 803, 804, or 807 applies.[17] Consequently, unlike evidentiary rulings that are within the trial court's discretion, the admission of hearsay is reviewed under a harmless-error standard.[18]
In a civil case, harmless error is an error that does not affect the substantial rights of the parties.[19]
As for the statement by Dr. Osher, we note that before Dr. Osher had the opportunity to summarize information contained in Dr. Aziz's deposition concerning Ruth Hughes, an objection was raised. The objection was overruled, and the court adjourned for the evening. The next morning, Dr. Osher, without reading Dr. Aziz's deposition, stated the following: "When we finished last night, I referred to a deposition with Doctor Aziz, where he acknowledged that he would not have scheduled the YAG laser in the other eye himself, given the way the other capsule looked. And that's where we left off." Without actual testimony as to the contents of the deposition, it appears that the issue here is not whether the court improperly admitted hearsay about Dr. Aziz's deposition testimony, but rather whether Dr. Osher provided an accurate synopsis of his testimony from the previous day. Given that, we are persuaded that the issue was fundamentally one going to the weight and sufficiency of the evidence, and therefore any error in admitting the evidence did not affect any substantial rights of Howard or Tri-State.
Tri-State and Howard also contend that the trial court erred in admitting Hill's hearsay testimony that the information contained in his report (which was shown to the jury) was an accurate representation of what eight doctors had relayed to Hill about Howard. Hill, a local television reporter who had investigated Howard's medical practices as an ophthalmologist, testified, in part, about his methods of investigation. Having reviewed the record, we conclude that the admission of Hill's statements did not affect any substantial rights of Howard or Tri-State. Defense counsel had the opportunity to cross-examine Hill about his report and effectively did so. Thus, we conclude that the admission of the statements was harmless. For the reasons set forth above, the second assignment of error is overruled.
In the third assignment of error, Howard and Tri-State contend that portions of Dr. Osher's testimony were inadmissible under Evid.R. 402 and 404(B) because they were highly prejudicial and inflammatory, and because Osher had testified to matters that were outside his scope of expertise. The fourth issue presented for our review is whether the trial court erred in overruling Howard's and Tri-State's motion for a mistrial. We address these assignments in the aggregate.
Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pursuant to Evid.R. 402, evidence that is not relevant is inadmissible. Evid.R. 403(A) mandates that relevant evidence should be excluded when the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. A trial court is, nevertheless, vested with broad discretion when determining whether evidence is "relevant" pursuant to Evid.R. 401 and 402, and whether the adverse effect of relevant evidence "substantially outweig[hs]" its probative value pursuant to Evid.R. 403.[20] A reviewing court is, therefore, limited to a determination whether the trial court abused its discretion in admitting the disputed evidence.[21] Absent an abuse of discretion that materially prejudices a party, the trial court's decision must stand.[22]
Dr. Osher stated the following over objections:
 I just want to make a couple of comments on the cataracts. Just a few patients, I won't comment on.
 I've shown you the anatomy of the diagnostic approach. Forget the indications for surgery. Forget the indications when you see Doctor Howard's cases in a moment. Look at the size of that. There are no significant cataracts. And he's operating needlessly. * * *
 Dr. Osher later testified over objections, "I have seen four of Dr. Howard's patients with permanent serious complications. One resulted in blindness." Howard and Tri-State moved for a mistrial based on this testimony.
Howard and Tri-State now appear to argue that Dr. Osher's statements relating to whether Howard "ignore[s] indications for surgery" and "operates needlessly" misled the jury, because Howard had treated the eleven plaintiffs for different conditions and with different procedures, and because Dr. Osher should have discussed his opinions as to those patients separately. Their argument, however, ignores the fact that Dr. Osher did in fact discuss the plaintiff's cases individually and in depth. Insofar as there was any potential prejudice from Dr. Osher's statements, we are mindful that the jury was obviously not confused by the presentation of the evidence given its disposition of the case. As a result, we hold that the trial court did not abuse its discretion in admitting Dr. Osher's testimony.
Howard and Tri-State argue that Dr. Osher's second comment relating to the instance of blindness invoked Evid.R. 404(B), but we do not agree. Pursuant to Evid.R. 404(B), evidence of other crimes, wrongs, or acts are not admissible to prove conforming conduct by the defendant. "Other acts" evidence is, however, admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[23] The decision to admit or exclude relevant evidence is within the sound discretion of the trial court.[24]
The contested comment was admissible for purposes other than showing Howard's conforming conduct because the comment related to one or more of the following: Howard's motive to perform medically unnecessary surgeries; his knowledge as an ophthalmologist; and an absence of mistake or accident. Therefore, the trial court did not abuse its discretion in admitting Dr. Osher's testimony. Having found no error in the admission of the contested testimony, we further hold that the trial court did not err in overruling the motion for a mistrial.
Howard and Tri-State also assert that other portions of Dr. Osher's testimony violated Evid.R. 404(B). In two of the contested instances where Dr. Osher commented on an ophthalmologist in Chicago and accused Howard of "raping the Hippocratic Oath," no objections were raised. The errors, therefore, were not preserved for appeal, and we decline to consider them as plain error.[25]
In the third instance, an objection was raised. In this instance, Dr. Osher testified about a "similar" case in Dayton involving another doctor. In view of this opinion testimony and in the full context in which the testimony was given, we are unconvinced that the testimony was substantially outweighed by any danger of unfair prejudice. The testimony was relevant in order to rebut the conspiracy theory raised against Dr. Osher, because it emphasized his concern about physicians who, in his opinion, deviated from the standard of care. Accordingly, we find no error in admitting this part of Dr. Osher's testimony.
Finally, Howard and Tri-State maintain that Dr. Osher was not qualified as an expert in handwriting; therefore, it was impermissible for him to testify about matters relating to whether the charts of Ruth Siuda and Lora Maxwell had been altered. While Dr. Osher was not qualified as an expert in handwriting, we agree with the plaintiffs that Dr. Osher's testimony fell within his qualifications as an expert pursuant to Evid.R. 702, because it related to specialized information, namely reviewing a medical record when making a medical diagnosis, and because no prejudice was demonstrated. Accordingly, the trial court did not abuse its discretion in overruling the objections and admitting the testimony. For the reasons set forth above, the third and fourth assignments of error are overruled.
In the fifth assignment of error, Howard and Tri-State maintain that the trial court erred by awarding prejudgment interest. We do not agree.
Prejudgment interest may be awarded pursuant to R.C. 1343.03(C). "The purpose of R.C. 1343.03(C) is to encourage litigants to make a good faith effort to settle their case, thereby conserving legal resources and promoting judicial economy."[26] In order to award prejudgment interest, a trial court must find that the party required to pay the judgment failed to make a good-faith effort to settle the case, and that the party to whom the judgment is to be paid did not fail to make a good-faith effort to settle the case.[27] Good faith, as defined by the Ohio Supreme Court, consists of the following: (1) full cooperation in discovery proceedings, (2) rational evaluation of risks and potential liability, (3) no unnecessary delay of the proceedings, and (4) a good-faith settlement offer or a response in good faith to an offer from the other party.[28] The decision whether to award prejudgment interest lies within the sound discretion of the trial court.[29]
Defense counsel argued below that the defendants had extended settlement offers to each individual plaintiff in good faith, but that the plaintiffs had failed to negotiate in good faith by failing to make individual claims. We note that Howard and Tri-State now appear to base their argument on the mistaken belief that the cases should never have been consolidated in the first place. As we have already held, the trial court did not err in consolidating the cases. Under these circumstances, any settlement offer extended after the order granting consolidation on April 14, 1999, should have treated the cases in consolidated fashion.
The record is clear that, at least eight months prior to trial, plaintiffs' counsel made repeated attempts to negotiate with Howard and Tri-State. Two days before trial, Howard and Tri-State flatly refused to negotiate a settlement until an offer was made that treated the cases on an individual basis. According to an affidavit filed by one of the plaintiffs' attorneys, the day before the trial commenced, defense counsel finally evaluated the case at $1.3 million, but counsel refused to offer that amount as a settlement due to the absence of client approval. On February 1, 2000, Howard made a settlement offer to each plaintiff. Howard offered the following to the prevailing plaintiffs: (1) $10,000 to Ruth Hughes, (2) $45,000 to Lora Maxwell, and (3) $15,000 to Ruth Siuda. The total aggregate settlement offered was $272,500. The offer included restrictions as to the presentation of evidence and the testimony of expert witnesses. No offer was apparently made on behalf of Tri-State. During a pretrial conference transcribed for the record, the trial court stated that the amount finally offered by defense counsel was too low and not made in good faith. No offers were made once the trial commenced.
Following the trial, Ruth Hughes was awarded $950,000, Lora Maxwell was awarded $1,000,000 and Ruth and Oscar Siuda were awarded $350,000. Given the lengthy delay in negotiating with the plaintiffs, the demands made by defense counsel when proposing an offer, and the low offers, we cannot say that the trial court erred in determining that Howard and Tri-State had failed to make a settlement offer in good faith. The fifth assignment of error is, therefore, overruled.
For ease of analysis, we now address the sixth, seventh, eighth, and ninth assignments of error out of order. In the ninth assignment of error, Howard and Tri-State maintain that the trial court erred in overruling their motions for a directed verdict, because competent expert testimony was not admitted about the standard of care applicable to Ruth Hughes.
In considering a motion for a directed verdict, the trial court should construe the evidence most strongly in favor of the party opposing the motion. The court should grant the motion only when reasonable jurors could only come to one conclusion and that conclusion is adverse to the party opposing the motion.[30] It is well established that a motion for a directed verdict presents a question of law going to the sufficiency of the evidence, and that the court must not consider the weight of the evidence or the credibility of the witness.[31] This court reviews a ruling on a motion for a directed verdict de novo.[32]
In their motion for a directed verdict, which was argued by agreement of all parties after the trial had concluded, Howard and Tri-State reasoned that a directed verdict was appropriate because Dr. Osher was not qualified to give an expert opinion about the standard of care as it related to the plaintiffs. Specifically, they maintained that Dr. Osher did not meet the fifty-percent rule for the active practice or teaching of medicine. On appeal, Howard and Tri-State now maintain that, because Dr. Osher's competency was not established at trial under Evid.R. 601(D), there was insufficient evidence for Ruth Hughes to overcome a directed-verdict motion.
Evid.R. 601 provides, in part, that every person is competent to be a witness except any person giving expert testimony on the issue of liability in a civil action against a physician arising out of diagnosis, care or treatment by a physician, "unless" the person testifying is licensed to practice medicine and surgery, * * * by the state medical board or by the licensing authority of any state, and
unless the person devotes at least one-half of his or her professional time to the active clinical practice in his or her field of licensure, or to its instruction in an accredited school. [Emphasis added.]"[33] The experience required by Evid.R. 601(D) insures that the witness has some actual knowledge of the daily care of patients, which is the particular foundation that qualifies a witness to opine whether an action by a treating physician has deviated from the standard of conduct imposed by the medical community. The determination of the competency of a medical witness to testify is a discretionary one, and it will not be reversed on appeal absent an abuse of discretion.[34] For Dr. Osher's testimony to have been admissible, the record had to show that he was licensed to practice medicine and that he had devoted at least one-half of his professional time to active clinical practice or to its instruction at an accredited school. The term "active clinical practice" not only includes those physicians who spend their professional time treating patients, but also encompasses the physician-specialist whose work is so related or adjunctive to patient care as to necessarily be included in Evid.R. 601(D).[35]
The record in this case establishes that, at the time of the trial, Dr. Osher was board-certified in ophthalmology and licensed to practice medicine in Ohio and Kentucky. The record further establishes that, as a part of his practice, Dr. Osher was the medical director for the Cincinnati Eye Institute, consulted with patients, reviewed patients records, engaged in research for improving lens implants, and published numerous articles, books, and videotapes relating to ophthalmology. Dr. Osher was a full-time faculty member at the American Academy of Ophthalmology and had taught classes for numerous other societies. And Dr. Osher had been listed in the Best Doctors in America since 1992, he had been listed as one of the top cataract surgeons in the United States by Ophthalmology Times, and he had recently won an award from the American Academy that was the highest honor given to cataract surgeons by the academy. These facts lent support to the trial court's finding that Dr. Osher was, at the time of the litigation, sufficiently involved in active clinical practice and/or teaching within the meaning of the evidence rule. Accordingly, the trial court did not abuse its discretion in determining that the requirements of Evid.R. 601(D) had been satisfied.
Dr. Osher was the only expert to testify about Howard's breach of the standard of care in relation to Ruth Hughes. Given our finding that Dr. Osher was qualified to testify as an expert, we hold that, as a matter of law, sufficient evidence in the form of Dr. Osher's testimony was presented regarding the standard of care as it applied to Ruth Hughes. The ninth assignment is overruled.
In the seventh assignment of error, Howard and Tri-State argue that the trial court erred in overruling their motions for jnov and a new trial. In particular, they argue that, because evidence was not presented that Howard had acted with actual malice against Lora Maxwell and Ruth Hughes, or that Tri-State had ratified Howard's conduct, excessive punitive damages were awarded to Lora Maxwell and Ruth Hughes in violation of Civ.R. 59(A)(4) and Civ.R. 59(A)(6).
Civ.R. 59(A) states, in relevant part, that a new trial may be "granted to all or any parties and on all or part of the issues upon the following grounds * * * (4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice * * * or (6) The judgment is not sustained by the weight of the evidence * * *." Pursuant to Civ.R. 59(A)(6), a new trial should be granted where the jury's verdict is not supported by competent, substantial, and credible evidence.[36] To support a finding of passion or prejudice, pursuant to Civ.R. 59(A)(4), it must be demonstrated that the jury's assessment of the damages was so overwhelmingly disproportionate as to shock reasonable sensibilities.[37] In evaluating the propriety of the trial court's decision premised on an assessment of the weight of the evidence, a reviewing court may reverse only upon a demonstrated abuse of discretion.[38]
R.C. 2315.21 governs the recovery of punitive and exemplary damages in tort actions. For a plaintiff to recover punitive damages in a tort action, the plaintiff must show by clear and convincing evidence that "[t]he actions or omissions of [the] defendant demonstrate malice, aggravated or egregious fraud, oppression, or insult, or that defendant as principal or master authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate [and] the plaintiff in question has adduced proof of actual damages that resulted from the actions or omissions as described [above]."[39] For an award of punitive damages, actual malice is defined as either behavior characterized by "hatred, ill will, or a spirit of revenge or a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm."[40] The purpose of punitive damages is not to compensate the plaintiffs, but to punish and deter certain conduct.[41]
Here, the trial court instructed the jury to complete interrogatories relating to punitive damages. After filling out the interrogatories as they pertained to each plaintiff, the jury awarded punitive damages to Lora Maxwell and Ruth Hughes. The trial court's decision on the motion for a new trial involved questions of fact. Having reviewed the record, we cannot say that the trial court abused its discretion in overruling Howard's and Tri-State's motion for a new trial on the issue of punitive damages.
Although Dr. Thomas Steedle testified for the defendants that Howard had acted within the standard of care in treating Lora Maxwell and Ruth Hughes, and that they were not damaged as a result of Howard's care, we are persuaded that the trial court was better situated to pass on issues of credibility involved in his testimony and that of other witnesses.
The record demonstrates that Howard performed two cataract surgeries on Ruth Hughes's right and left eyes. After her cataract surgery, Howard recommended YAG surgery for both eyes to correct scar-tissue damage that had formed following the cataract surgeries. Following the YAG surgery in her right eye, Ruth Hughes developed an infection in her cornea, sought a second opinion, and cancelled the YAG surgery for her left eye. At trial, Dr. Osher concluded that the YAG surgery in the right eye had been medically unnecessary, that the YAG surgery scheduled for the left eye was unnecessary, and that Dr. Howard had breached the standard of care in performing cataract and YAG surgeries and in recommending the second YAG surgery.
The record further demonstrates that Howard performed two glaucoma surgeries, one on each of Lora Maxwell's eyes, and that he had also proposed cataract surgery for both eyes. Dr. Osher, who examined Lora Maxwell after she sought a second opinion, testified at trial that Lora Maxwell had no evidence of glaucoma damage, thereby suggesting that glaucoma surgeries were medically unnecessary, and that there was no need for cataract surgery in either eye. Given his findings, Dr. Osher opined that the glaucoma surgeries and the proposed cataract surgery were unjustified. Dr. Osher further testified that Howard had breached the standard of care when treating Lora Maxwell, that Howard's treatment was in total disregard for her safety, and that Howard had misrepresented the need for glaucoma and cataract surgeries to Lora Maxwell. Dr. Kolker, a glaucoma and cataract specialist, also testified that nothing in the record justified operating for glaucoma, and that the treatment of Lora Maxwell for both glaucoma and cataracts fell below the standard of care. Finally, both Drs. Kolker and Osher stated that Howard had failed to consider non-surgical options, such as eye drops or a change in prescriptions, before proposing surgery for Lora Maxwell.
Dr. Osher cautioned that most unnecessary eye surgery caused permanent damage to the operated eye. And, in Dr. Osher's expert medical opinion, subjecting patients to unnecessary surgery was harmful and did not fall within the standard of care in the medical community. Given those factors, Dr. Osher opined that Ruth Hughes and Lora Maxwell had suffered damage to their eyes by the mere fact that they had undergone surgery where there was no need for surgery in the first place. Further, Dr. Osher opined that Ruth Hughes had suffered permanent eyesight damage to her right eye from the YAG surgery.
In sum, substantial competent, credible evidence was presented that Howard had acted with a conscious disregard for the rights and safety of Ruth Hughes and Lora Maxwell, and that such disregard had a great likelihood of causing harm. Accordingly, the trial court did not abuse its discretion in denying the motion for a new trial as it applied to Howard and to the award of punitive damages to Ruth Hughes and Lora Maxwell.
Next, we address the propriety of awarding $250,000 punitive damages to both Ruth Hughes and Lora Maxwell against Tri-State. Pursuant to R.C.2315.21(B)(1), an employer is not liable for punitive damages unless the employer authorized, participated in, or ratified the actions of the employee. In general, an employer authorizes acts committed within the scope of employment, either expressly or impliedly.[42] When an employee is acting within the scope of his employment, the doctrine ofrespondeat superior applies, and the plaintiff need not prove ratification to hold the employer liable for punitive damages.[43] But if an employee's act is outside the scope of employment, the plaintiff must demonstrate that the employer ratified the willful and malicious conduct of the employee.[44] Generally, the determination of whether an employee has acted within the scope of his employment is a question of fact to be decided by the jury.[45]
Here, the parties stipulated at trial that Howard had been employed and was still employed by Tri-State. The record demonstrates that Howard's examination and treatment of, as well as the surgeries performed on, Ruth Hughes and Lora Maxwell occurred during the scope of his employment. Consequently, because the evidence supported a finding that Howard was acting within the scope of his employment when he attended to Ruth Hughes and Lora Maxwell, we cannot say that the trial court abused its discretion in refusing to grant a new trial for the claims against Tri-State and the award of punitive damages to Ruth Hughes and Lora Maxwell.
In their statement of the assignments of error for review, Howard and Tri-State have also assigned as error the trial court's denial of their motion for jnov. In their motion, Howard and Tri-State argued that pretrial summary judgment should have been granted to them because nothing in the record supported a determination that the testimony of Drs. Kolker and Osher met the requirements of Evid.R. 601(D), and that, in the alternative, judgment should have been entered for them in light of the fact that Drs. Kolker and Osher did not meet the competency requirements of Evid.R. 601(D) at trial. In their brief before this court, however, Howard and Tri-State have neglected to provide any argument relating to either of these issues. Pursuant to App.R. 16(A)(7), we decline to address the assignment insofar as it challenges the trial court's denial of their motion for jnov.[46] The seventh assignment is, therefore, overruled.
Howard and Tri-State allege in the sixth assignment of error that the trial court erred in awarding attorney fees and costs to plaintiffs and in denying their own application for costs.
We first address the propriety of basing the award of attorney fees on all the damages recovered, including the damages recovered by Ruth Siuda, who was not awarded punitive damages. In support of their argument, Howard and Tri-State contend that an award of punitive damages is a prerequisite to an award of attorney fees in a tort case.
The jury in this case was required to complete special interrogatories relating to the damages awarded to each plaintiff. The special interrogatories identified the amount, if any, of damages to be received by the plaintiffs. The form required the jurors to determine the following:
 1. What amount will fairly and adequately compensate Plaintiff * * * for the damages [she or he] has sustained or will sustain?
$____________________
 2. Do you find that Plaintiff * * * is entitled to an award of punitive damages against Dr. Howard?
 Yes ___ No ________ If "yes," in what amount? $___________
 3. Do you find that Plaintiff * * * is entitled to an award of punitive damages against Tri-State Eye Care?
 Yes ___ No________ If "yes," in what amount? $____________
 4. Do you find that Plaintiff * * * is entitled to attorney fees?
Yes ___ No _______
For the plaintiffs whose spouses brought loss-of-consortium claims, the form also called for findings on the derivative claims brought by David Himmelblau, Sallie Bell, Jimmie Peters, John Prine, Joyce Venable, William Thomas, and Oscar Siuda.
Generally, in order to award attorney fees in the absence of statutory authorization, a jury must make a finding of malice and actually award punitive damages.[47] Here, however, the general verdict form did not include an instruction allowing for the consideration of attorney fees only upon an award of punitive damages. Rather, the verdict form did not apprise the jurors that they could only award attorney fees after awarding punitive damages to the plaintiffs. No objections were made relating to the form at any time during the conference with the trial court about the interrogatories and the verdict form, or during the trial court's instructions to the jury. The failure to object to the verdict form directly contributed to the errors of which Howard and Tri-State now complain.
Pursuant to Civ.R. 51(A), a party may not assign as error on appeal "the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." It is well settled that errors arising during the course of the trial that are not brought to the attention of the court by objection or otherwise are waived and may not be raised on appeal.[48] Thus, absent an objection, we review the absence of an instruction only for plain error.[49] We find no such error here.
In this case, the parties used special interrogatories to supplement the general verdict form. As we have already held, the trial court did not err in awarding punitive damages to Ruth Hughes and Lora Maxwell; therefore, the jury's award of attorney fees to them was proper. Further, without the full punitive-damage instruction, the verdict form reasonably led the jurors to believe that they had the legal authority to award attorney fees to Ruth Siuda without awarding punitive damages.
Moreover, despite defense counsel's arguments to the contrary, fees were not awarded to the non-prevailing plaintiffs. When determining the amount of attorney fees, the court stated at the hearing on fees that it had considered the forty-percent contingency-fee arrangement, the time and labor expended in the litigation, the experience and skill of the attorneys, the complexity and difficulty of the questions involved, and the expenses of litigation.[50] Based on the court's consideration of all these factors and the fact that no objection to the jury instruction was made at the time that the error occurred, we cannot say that the error in basing attorney fees on Ruth Siuda's damages in addition to the damages recovered by Lora Maxwell and Ruth Hughes seriously affected the basic fairness, integrity, or public reputation of the judicial process.[51]
Howard and Tri-State also submit that the trial court erred when awarding costs pursuant to Civ.R. 54(D), because the amount awarded to the plaintiffs was based, in part, on costs incurred while representing the nonprevailing plaintiffs. We do not agree.
Civ.R. 54(D) states, "Except when express provision therefore is made either in a statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs." (Emphasis added.) Howard and Tri-State submit that the Bells, the Himmelblaus, the Peterses, the Prines, the Thomases, the Venables, Rita Lawson, and Linda Nickle were not "prevailing parties" pursuant to the statute. Despite their argument to the contrary, Civ.R. 54(D) is clear that costs may still be awarded in the court's discretion regardless of the "prevailing party" language. Civ.R. 54(D) itself places the ultimate responsibility for the assessment of costs upon the court and, as a result, permits a court to award costs in its discretion unless another rule or statute directs otherwise.[52] Accordingly, we hold that the taxing of court costs against Howard and Tri-State was proper under the circumstances and did not constitute an abuse of discretion. For the foregoing reasons, the sixth assignment of error is not well taken and is overruled.
In the eighth assignment of error, Howard and Tri-State argue that the trial court erred in denying their motions for summary judgment on all the plaintiffs' claims. In their motion, Howard and Tri-State argued that Drs. Osher and Kolker were not competent to testify as experts as to the standard of care within the medical community, whether there was a breach of that standard of care by Howard, and whether Howard's negligence had proximately caused injury to the plaintiffs. In support of their contention that no genuine issues of material fact remained to be resolved, Howard and Tri-State gave one or more of the following arguments against Charles and Joyce Venable, Linda Nickle, George and Sallie Bell, Ruth and Oscar Siuda, Lora Maxwell, Rita Lawson, Joyce and David Himmelblau, Mary Sue and John Prine, Ruth Hughes, and Sylvia and William Thomas: (1) no evidence was presented demonstrating an applicable standard of care in the medical community; (2) there was no evidence that Howard had deviated from a standard of care; (3) there was no evidence of damages suffered by the plaintiffs; (4) plaintiffs signed consent forms for surgery; and (5) the claims fell outside the one-year statute of limitations. Nothing in the record indicates that Howard and Tri-State filed a motion for summary judgment against Nettie or Jimmie Peters, but Howard and Tri-State argued at the summary-judgment hearing that Nettie Peters had failed to present evidence of a deviation from the standard of care and resulting damages, and that she had consented to surgery.
In response to Howard and Tri-State's motion for summary judgment, the plaintiffs submitted two reports from Drs. Kolker and Osher, which, according to the plaintiffs, demonstrated a standard of care in the medical community, a breach of that standard of care by Howard, and resulting injury. At the summary-judgment hearing, deposition testimony of Drs. Osher and Kolker was also admitted into the record. At the hearing, Howard and Tri-State challenged the admissibility and authenticity of Drs. Osher's and Kolker's opinions in their reports.
Like a motion for directed verdict, a summary-judgment motion requires that the trial court, upon viewing the evidence in the light most favorable to the nonmoving party, determine whether there is no genuine issue of material fact, whether the moving party is entitled to judgment as a matter of law, and whether reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party.[53]
To resolve this assignment of error, however, we need not reach the merits of Howard and Tri-State's argument.
The Ohio Supreme Court has held that any error in the denial of a pretrial motion for summary judgment is rendered moot or harmless when a subsequent trial on the same issues reveals that there are genuine issues of material fact.[54] Under such circumstances, the denial of a motion for summary judgment is generally harmless, and it is not validly a point of consideration on appeal from a final judgment entered following a trial on the merits. But when a motion for summary judgment is predicated on a pure question of law, such as the legal effect of a party's failure to timely respond to requests for admissions, the denial of the motion is not harmless.[55] Thus, a narrow opening exists for appellate review of the denial of summary judgment after a cause of action has proceeded to a final judgment at trial if the adverse ruling is based on a pure question of law.[56]
Whether an expert is competent to testify is ordinarily a question of law reserved for the court. But the facts of this case as we now know them show that Dr. Osher was competent to testify as an expert, and the evidence adduced at trial revealed the existence of genuine issues of material fact concerning the negligence claims brought by Ruth Hughes, Ruth Siuda, and Lora Maxwell. Further, Dr. Kolker's competency has not been challenged in this appeal. Because the full development of the facts at trial showed that Ruth Hughes, Ruth and Oscar Siuda, and Lora Maxwell were entitled to judgment, any error in the denial of Howard's and Tri-State's motion for summary judgment was harmless. Thus, we hold that the determination of whether Drs. Osher and Kolker were appropriate experts under the rules of evidence here was not the type of "pure" question of law contemplated by the Ohio Supreme Court. Accordingly, this assignment of error is not well taken insofar as it pertains to Ruth Hughes, Ruth and Oscar Siuda, and Lora Maxwell.
Further, because Howard and Tri-State prevailed at trial against Linda Nickle, Joyce and David Himmelblau, George and Sallie Bell, Nettie and Jimmie Peters, Mary Sue and John Prine, Rita Lawson, Charles and Joyce Venable, and Sylvia and William Thomas, there was no prejudice in the trial court's decision overruling the motions for summary judgment as to the nonprevailing parties. Accordingly, the eighth assignment of error is overruled.
In their tenth assignment of error, Howard and Tri-State allege that the trial court erred when it gave the jury a dictionary definition of "injury." Howard and Tri-State maintain that the court's clarification of the definition impermissibly broadened the characterization of what constituted an injury for purposes of the plaintiffs' malpractice claims. They argue that, in a medical malpractice case, injury means "actual physical injury," and that the trial court improperly expanded injury in this case to include rights, reputation, property, feelings and dignity. In support of their contention that injury should only have been defined as a physical injury, Tri-State and Howard cite Zimmie v.Calfee, Haiter Griswold.[57] That case involved professional malpractice and did not hold that injury can only mean "physical injury." In fact, we have found no case law or statute suggesting that the term "injury" should be limited only to "physical injury" in medical malpractice cases.
When clarifying the word "injury" for the jury, the trial court apparently thought that the jurors had been seeking such clarification as an aid in determining damages. In response to their question, the trial court stated that it was offering a "common sense" definition of injury that encompassed language from several dictionaries, including both legal and lay dictionaries. The court then redefined injury over objections as the following: "any wrong or damage done to another, either in his person, rights, reputation, or property, the invasion of any legally protected interest of another, and offense against a person's body, feelings, or dignity."
A reading of the court's answer to the jury's question does not indicate that the court impermissibly enhanced the scope of damages. Even if we were to hold that the clarification was impermissible, it was not misleading to the jury in the context of the court's instructions in their entirety.[58] When originally giving the jury instructions, the court had stated to the jury that words "are to be given their normal and customary meaning in the English Language * * *." Further, the court instructed the jury that, when determining damages, it should consider the following types of damages: (1) actual injury and damage proximately caused by the negligence of Tri-State and Howard; (2) loss of ability to perform usual functions; (3) emotional distress; (4) permanent injury and expense; (5) expected life; (6) future damages; (7) loss of consortium; and (8) punitive damages. Of relevance here, "emotional distress" was defined by the court to include feelings of "humiliation," "mortification," "nervousness," "grief," "anxiety," "worry," and "apprehension." Because the court instructed the jury without objection to consider, among other damages, mental pain and suffering, we cannot say that the trial court erred when clarifying the definition of injury for the purposes of determining damages. The tenth assignment of error is, therefore, overruled.
In their final assignment of error, Howard and Tri-State contend that the trial court erred by permitting opposing counsel to present impermissible and prejudicial closing arguments. They allege that it was reversible error for opposing counsel to make highly inflammatory remarks comparing Howard to a "rapist." Specifically, they object to the following statement made by counsel over objections:
 You are allowed to send a message to the community, to the would-be Doctor Howards, to the other doctors that are out there that would try to run an assembly line type of operation. You are allowed by your conduct in this courtroom to tell them you're not going the [sic] permit it. The benefit of this verdict goes to our plaintiffs, true. But the message goes to everybody. The message goes to everybody.
 Now, if somebody comes in here and says, `Not one penny' I was thinking about that. You know, if somebody were to come in here and tell a rape victim that survived the case or a kidnap victim that escaped, that there was no physical injury, that there was no damage [,] that there was no harm [.] You wouldn't listen to that. You wouldn't listen to that.
 Counsel is generally afforded broad latitude in closing argument.[59] Inferences and deductions drawn from the evidence adduced at trial are ordinarily a legitimate subject of argument.[60]
But when the argument is not supported by the evidence and is used to arouse prejudice or to misrepresent the evidence to the extent that there is a substantial likelihood that the jury will be misled, it is improper.[61] The trial court has the discretionary power to determine whether the bounds of permissible closing argument have been exceeded, and we will not reverse the trial court's decision unless there has been an abuse of its discretionary power.[62] In order to disturb the trial court's exercise of discretion here, the record must demonstrate "highly improper argument by counsel that tend[ed] to inflame the jury."[63]
Having reviewed the totality of counsel's argument, we cannot agree that the comment disparaged Howard or misrepresented the evidence. Counsel's comment relating to "not one penny" was made in response to defense counsel's comment in closing argument that not one "penny should be given to [the plaintiffs]." Because the comment was made in response to the issue of damages, we cannot say that, when viewed in light of the entire closing argument, it tended to disparage Howard or to inflame the jury. Further, we note that the remarks made to the jury had little impact since the verdict it returned was only in favor of Ruth Hughes, Lora Maxwell, and Ruth and Oscar Siuda, and since only two of them were awarded punitive damages. For these reasons, we hold that Tri-State and Howard have failed to demonstrate any prejudicial effect. Accordingly, the trial court's actions did not constitute an abuse of discretion, and we overrule the final assignment of error brought by Howard and Tri-State.
We now address the cross-appeal of George and Sallie Bell, Joyce and David Himmelblau, Rita Lawson, Linda Nickle, Nettie and Jimmie Peters, Mary Sue and John Prine, Sylvia and William Thomas, and Charles and Joyce Venable. In their first assignment, the cross-appellants allege that the trial court improperly instructed the jury concerning a finding on battery in connection with the interrogatories. They maintain that because an interrogatory was not provided for the claims related to battery, and because the court instructed the jury to consider the interrogatories before the general verdict form, the jury was precluded from considering the battery claim on the general verdict form.
Six interrogatories were provided for the jury's consideration with respect to the claims of Linda Nickel, Ruth Hughes, Joyce Himmelblau, Ruth Siuda, George Bell, Nettie Peters, Mary Sue Prine, Rita Lawson, Charles Venable, Lora Maxwell, and Sylvia Thomas. The interrogatories related to their claims for negligence, injury resulting as a direct and proximate cause of the negligence, failure to obtain consent, damage as a result of the lack of informed consent, and fraud. The interrogatories were assembled and approved by both parties at a conference with the trial court.
The court also adopted a general verdict form, which derived from a proposal by plaintiffs' counsel. On the general verdict form, the jury was required to check two of the following statements as they pertained to plaintiffs Linda Nickel, Ruth Hughes, Joyce Himmelblau, Ruth Siuda, George Bell, Nettie Peters, Mary Sue Prine, Rita Lawson, Charles Venable, Lora Maxwell, and Sylvia Thomas:
 ___ We find in favor of Plaintiff * * * and against Defendant Howard
 ___ We find in favor of Plaintiff * * * and against Defendant Tri-State
 ___ We find against Plaintiff * * * and in favor of Defendant Howard
 ___ We find against Plaintiff * * * and in favor of Defendant Tri-State
Our review of the record reveals that, in the discussion with the court before the instructions were given, plaintiffs' counsel did not object either to the inconsistency in the interrogatories or to the court's instruction that the jury was to consider the interrogatories before the general verdict.[64] And no objection was lodged to the change in the interrogatory that was made when the court delivered its instructions, which included a reading of the interrogatories.[65]
Since plaintiffs' counsel failed to object to the exclusion of the battery theory in the special interrogatories, the issue cannot be raised on appeal absent plain error.[66] But we decline to find plain error here where plaintiffs counsel invited the error. Under the "invited error" doctrine, a party may not take advantage of an error that he himself invited or induced the trial court to make.[67] Since any error in the failure to provide an interrogatory relating to the battery claim was induced by plaintiffs' own assent to the wording of the interrogatories, they arguably cannot now claim that they were prejudiced by its exclusion. Moreover, had the plaintiffs' included findings as to all three claims on the general verdict form adopted by the court, there would have been no discrepancies between the interrogatories and the general verdict form. Accordingly, we overrule the first assignment in the cross-appeal.
In their second assignment, the cross-appellants argue that the trial court erred in denying their motion for a new trial or for jnov on their negligence claim, because the verdicts were against the weight of the evidence. In their third assignment, the cross-appellants argue that the trial court erred in denying their motion for a new trial or for jnov on their informed-consent claim, because the verdicts were against the weight of the evidence. For ease of analysis, we address these assignments in the aggregate.
As we have already noted, when deciding a motion for a new trial premised on Civ R.59(A)(6), the court must determine whether the verdict is against the manifest weight of the evidence, and it is granted discretion when choosing to grant or deny the motion.[68] In contrast, deciding whether to grant a motion for jnov does not require the court to weigh the evidence or to evaluate the credibility of the witnesses. Our standard of review for a ruling on a motion for jnov made pursuant to Civ.R. 50(B) is the same as that for a ruling on a motion for a directed verdict pursuant to Civ.R. 50(A),[69] except that a motion for jnov is evaluated on all of the evidence presented at trial.[70] Thus, a motion for jnov tests the legal sufficiency of the evidence and presents a question of law.[71]
In challenging the denial of their jnov motion, the cross-appellants assert that their evidence relating to negligence and informed consent was more credible than the evidence presented by Howard and Tri-State. But, in considering a motion for jnov, a court does not weigh the evidence or test the credibility of the witnesses.[72] The testimony and the evidence offered by the nonmoving party, here Howard and Tri-State, must be construed most strongly in their favor.[73]
Construing the evidence in this manner, we hold that reasonable minds could have concluded that Howard's treatment of George Bell, Mary Sue Prine, Linda Nickle, Joyce Himmelblau, Nettie Peters, Rita Lawson, Charles Venable, and Sylvia Thomas was within the appropriate standards of care, and that Howard obtained valid consent when performing cataract, glaucoma, and/or YAG surgery on George Bell, Mary Sue Prine, Linda Nickle, Joyce Himmelblau, Nettie Peters, Rita Lawson, Charles Venable, and Sylvia Thomas.
In challenging the denial of their motion for a new trial, the cross-appellants make much of the fact that they presented competent, credible evidence to support their allegations of negligence and lack of informed consent. In particular, they direct us to the testimony of their experts, Drs. Osher and Kolker. Having reviewed the record in its entirety, we are persuaded that their points merely highlight the fact that there were conflicts in the evidence on nearly every aspect of this case and do nothing to negate the substantial credible evidence presented by Howard and Tri-State.
To prove their claim for medical negligence, the cross-appellants were required to establish the existence of a standard of care within the medical community, a breach of that standard of care by the defendants, and proximate cause between the medical negligence and the injury sustained.[74] The essence of this medical malpractice claim was whether the care and treatment by Howard fell below the appropriate standard of care. Expert testimony is generally required to prove the elements of medical malpractice whenever they are beyond the common knowledge and understanding of the jury.[75] After reviewing the record, we conclude that the evidence was sufficient to warrant a denial of their motion for a new trial. Given the testimony of Dr. Steedle, the jury could reasonably have concluded that Howard did not breach his duty of care in his treatment of George Bell, Mary Sue Prine, Linda Nickle, Joyce Himmelblau, Nettie Peters, Rita Lawson, Charles Venable, and Sylvia Thomas. Moreover, the jury could also have reasonably concluded that George Bell, Mary Sue Prine, Linda Nickle, Joyce Himmelblau, Nettie Peters, Rita Lawson, Charles Venable, and Sylvia Thomas were not injured as a result of the surgery performed and/or recommended by Howard. Accordingly, sufficient competent, credible evidence was adduced at trial to support a verdict in Howard's and Tri-State's favor on the negligence claims brought by George Bell, Mary Sue Prine, Linda Nickle, Joyce Himmelblau, Nettie Peters, Rita Lawson, Charles Venable, and Sylvia Thomas.
To establish a viable informed-consent claim for trial, it was necessary for the cross-appellants to demonstrate the following: (1) a physician failed to disclose the material risks and dangers potentially involved in a given course of treatment; (2) the undisclosed risks and dangers materialized as the proximate cause of injuries sustained by the patient; and (3) a reasonable person in the patient's position would have declined the treatment had the material risks and dangers been brought to light by the physician.[76] Medical expert testimony is normally necessary to establish the material risks, because the probability and magnitude of those risks is a matter of medical judgment.[77]
The record establishes that George Bell signed a consent form for the cataract surgery on his left eye and the scheduled surgery on his right eye; Mary Sue Prine signed a consent form for glaucoma surgery on her right and left eyes; Linda Nickle signed consent forms for cataract surgery on her right and left eyes in 1997 and for the YAG surgery scheduled for her left eye in 1997, but no consent forms are in the record relating to any eye surgery before 1997; Joyce Himmelblau signed consent forms for cataract surgery on her right and left eyes and the YAG surgery on her right eye; Nettie Peters signed consent forms for cataract surgery on her right and left eyes; Rita Lawson signed consent forms for glaucoma surgery on her right and left eyes and for cataract surgery on her right and left eyes; Charles Venable signed consent forms for cataract surgery on his right and left eyes; and Sylvia Thomas signed a consent form for a cataract surgery that was subsequently aborted. Except for the consent form signed by Sylvia Thomas, all the consent forms for cataract surgery identified the following risks: "infection, hemorrhage, or possible total loss of the eye." On the consent form signed by Sylvia Thomas, alternatives to surgery were identified in depth and complications from surgery were discussed in greater detail. On all of the consent forms for YAG surgery, the risks identified on the form included the following: "temporary increase in intraocular pressures, retinal detachment, failure of procedure to improve vision." On all the consent forms for glaucoma surgery, the risks identified included "blurred vision, temporary rise in intraocular pressure, failure of procedure to lower intraocular pressure."
The cross-appellants maintain that the signed consent forms were fraudulently or deceitfully obtained because Howard had falsely represented that surgery was required.[78] By raising the issue of fraud and/or deceit, the cross-appellants are again challenging whether Howard had acted within the standard of care in the medical community. Having already held that sufficient competent and credible testimony was presented relating to George Bell, Mary Sue Prine, Linda Nickle, Joyce Himmelblau, Nettie Peters, Rita Lawson, Charles Venable, and Sylvia Thomas, we find this argument to be feckless. To the extent that their assignment addresses whether Howard apprised George Bell, Mary Sue Prine, Linda Nickle, Joyce Himmelblau, Nettie Peters, Rita Lawson, Charles Venable, and Sylvia Thomas of the material risks associated with their surgeries, we are persuaded that competent and credible testimony, both expert and otherwise, was admitted to demonstrate that George Bell, Mary Sue Prine, Linda Nickle, Joyce Himmelblau, Nettie Peters, Rita Lawson, Charles Venable, and Sylvia Thomas were apprised of the material risks involved in cataract, glaucoma and/or YAG surgery. Though testimony was presented to the contrary, credibility was an issue to be resolved by the trier of fact, and we should not reverse its judgment if it is supported by some competent, credible evidence.[79] Confronted with conflicting competent and credible testimony, the trial court did not err in denying the motion for a new trial on the informed-consent claims.
 In sum, because there was competent, credible evidence presented at trial to support a verdict in favor of Tri-State and Howard on the negligence claims and the informed-consent claims brought by George Bell, Mary Sue Prine, Linda Nickle, Joyce Himmelblau, Nettie Peters, Rita Lawson, Charles Venable, and Sylvia Thomas, the trial court did not abuse its discretion in denying their motions for a new trial. The second and third assignments in the cross-appeal are overruled.
The final assignment in the cross-appeal addresses the propriety of defense counsel's closing arguments. The cross-appellants allege that defense counsel's closing argument was peppered with reprehensible remarks about plaintiffs' attorney Stanley Chesley and medical expert Dr. Osher. They point to the following statement as evidence of such objectionable misconduct:
 If you do not if you give money to these people with this set of circumstances, with this kind of evidence and this kind of trial, you will empower the Robert Oshers of the world, you will empower the Stanley Chesleys of the world, you'll empower these emperors who really the bottom line is they have no clothes. They have no credibility.
 The cross-appellants offered no objection below to the various remarks against Dr. Osher and attorney Chesley that they now assert were disparaging to their case.
Having reviewed the entire closing argument, we are not convinced that defense counsel's comments were disparaging or that they tended to inflame the jury. During plaintiffs' closing arguments, attorney Chesley began his remarks by analogizing this case to a nursery rhyme titled "The Emperor Has No Clothes." Chesley pointed out that, like the child in the nursery rhyme who truthfully told the powerful emperor that he had no clothes, the defense had been stripped of its clothes by failing to present evidence of a conspiracy theory. In reply, defense counsel turned the nursery rhyme on its head to show how the plaintiffs could be compared to the emperor. Basically, this analogy, as used by both plaintiffs' and defendants' counsel, related to the presentation of credible evidence. Under these circumstances, we cannot say that the trial court abused its discretion in permitting the comments during closing arguments.[80] Accordingly, the fourth assignment of error in the cross-appeal is overruled.
The judgment of the court of common pleas is hereby affirmed.
Judgment affirmed.
Gorman, P.J., and Winkler, J., concur.
[2] Claims were filed by Ruth and Oscar Siuda under the case number A-9802378; by Ruth Hughes under the case number A-9804397; by Lora Maxwell, Rita Lawson, Nettie and Jimmie Peters, Mary Sue and John Prine, and Charles and Joyce Venable under the case number A-9805831; by Linda Nickle under the case number A-9806989; by Joyce and David Himmelblau under the case number A-9804714; by Sylvia and William Thomas under the case number A-9804537; and by George and Sallie Bell under the case number A-9804413.
[3] Kenneth Lawson was also named as a party in this motion.
[4] See Transamerica Ins. Co. v. Nolan (1995), 72 Ohio St.3d 320,322, 649 N.E.2d 1229, 1231.
[5] See App.R. 3(A); Id. at syllabus.
[6] See Transamerica Ins. Co. v. Nolan, supra, at syllabus.
[7] See Maritime Mfrs. Inc. v. Hi-Skipper Marina (1982),70 Ohio St.2d 257, 436 N.E.2d 1034.
[8] See McDonnold v. McDonnold (1994), 98 Ohio App.3d 822, 827,649 N.E.2d 1236, 1239-1240.
[9] See Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140, 1142.
[10] See Jamestown Village Condo Owners Assn. v. Market MediaResearch, Inc. (1994), 96 Ohio App.3d 678, 687, 645 N.E.2d 1265, 1272;Waterman v. Kitrick (1990), 60 Ohio App.3d 7, 14, 572 N.E.2d 250,256.
[11] See Waterman v. Kitrick, supra, at 14, 572 N.E.2d at 257.
[12] Compare Evid.R. 803 with Fed.R.Evid. 803(18).
[13] See Stinson v. England (1994), 69 Ohio St.3d 451, 633 N.E.2d 532, paragraph two of the syllabus.
[14] See State v. Echols (1998), 128 Ohio App.3d 677, 698,716 N.E.2d 728, 742-743.
[15] See Goldfuss v. Davidson (1997), 79 Ohio St.3d 116, 121,679 N.E.2d 1099, 1103.
[16] Id. at syllabus.
[17] See Evid.R. 802.
[18] See Meyers v. Hot Bagel Factory, Inc. (1999), 131 Ohio App.3d 82,100-101, 721 N.E.2d 1068, 1081; State v. Sorrels (1991),71 Ohio App.3d 162, 165, 593 N.E.2d 313, 314-315.
[19] See Meyers v. Hot Bagel Factory, Inc., supra.
[20] See Cincinnati v. Banks (2001), 143 Ohio App.3d 272, 287,757 N.E.2d 1205, 1217; Brokamp v. Mercy Hospital Anderson (1999),132 Ohio App.3d 850, 863, 726 N.E.2d 594, 603.
[21] See Krischbaum v. Dillon (1991), 58 Ohio St.3d 58, 66,567 N.E.2d 1291, 1299.
[22] See id.
[23] Evid. R. 404(B).
[24] See State v. Bey (1999), 85 Ohio St.3d 487, 490, 709 N.E.2d 484,490.
[25] See Goldfuss v. Davidson, supra.
[26] Peyko v. Frederick (1986), 25 Ohio St.3d 164, 167,495 N.E.2d 918, 921.
[27] See Moskovitz v. Mt. Sinai Med. Ctr. (1994), 69 Ohio St.3d 638,658, 635 N.E.2d 331, 347.
[28] See Kalain v. Smith (1986), 25 Ohio St.3d 157, 495 N.E.2d 572, syllabus.
[29] See id. at 159, 495 N.E.2d at 574.
[30] See Civ.R. 50(A)(4).
[31] See Wagner v. Roche Laboratories (1996), 77 Ohio St.3d 116,119-120, 671 N.E.2d 252, 255-256; Titanium Indus. v. S.E.A., Inc. (1997)118 Ohio App.3d 39, 47-48, 691 N.E.2d 1087, 1093.
[32] See Titanium Indus. v. S.E.A., Inc., supra; Byrley v. NationwideLife Ins. Co. (1994), 94 Ohio App.3d 1, 18, 640 N.E.2d 187, 198.
[33] Evid.R. 601(D).
[34] See Campbell v. Warren Gen. Hosp. (1994), 105 Ohio App.3d 417,421, 664 N.E.2d 542, 544.
[35] See McCrory v. State (1981), 67 Ohio St.2d 99, 423 N.E.2d 156, syllabus
[36] See Dillon v. Bundy (1992), 72 Ohio App.3d 767, 773-774,596 N.E.2d 500, 504.
[37] See Jeanne v. Hawkes Hosp. of Mt. Carmel (1991), 74 Ohio App.3d 246,257, 598 N.E.2d 1174, 1181.
[38] See Rohde v. Farmer (1970), 23 Ohio St.2d 82, 262 N.E.2d 685, paragraph one of the syllabus.
[39] R.C. 2315.21(B)(1) and (2).
[40] Preston v. Murty (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus.
[41] See Moskovitz v. Mt. Sinai Med. Ctr., supra, at 651,635 N.E.2d at 343.
[42] See Fulwiler v. Schneider (1995), 102 Ohio App.3d 398, 406,662 N.E.2d 82, 86-87.
[43] See id. at 406, 662 N.E.2d at 87.
[44] See id.
[45] See Osbourne v. Leyles (1992), 63 Ohio St.3d 326, 330,587 N.E.2d 825, 829.
[46] See App.R. 16(A)(7).
[47] See Digital Analog Design Corp. v. North Supply Co. (1992),63 Ohio St.3d 657, 662, 590 N.E.2d 737, 742; Tulloh v. Goodyear AtomicCorp. (1994), 93 Ohio App.3d 740, 757, 639 N.E.2d 1203, 1214.
[48] See Schade v. Carnegie Body Co. (1982), 70 Ohio St.2d 207,436 N.E.2d 1001, paragraph one of the syllabus.
[49] See Goldfuss v. Davidson, supra; Capretta v. Goodson (Dec. 18, 2000), Cuyahoga App. No. 76932, unreported.
[50] See Villella v. Waikem Motors, Inc. (1989), 45 Ohio St.3d 36, 41,543 N.E.2d 464, 470, holding modified on other grounds in Moskovitz v.Mt. Sinai Med. Ctr. (1994), 69 Ohio St.3d 638, 635 N.E.2d 331, paragraph two of the syllabus.
[51] See Goldfuss v. Davidson, supra.
[52] See State ex rel. Fant v. Regional Transit Auth. (1990),48 Ohio St.3d 39, 548 N.E.2d 240.
[53] See Civ R. 56(C); State ex rel. Howard v. Ferreri (1994),70 Ohio St.3d 587, 589, 639 N.E.2d 1189, 1192; Temple v. Wean United,Inc. (1977), 50 Ohio St.2d 317, 327, 364 N.E.2d 267, 274.
[54] See Continental Ins. Co. v. Whittington (1994), 71 Ohio St.3d 150,642 N.E.2d 615, syllabus.
[55] See id. at 157, 642 N.E.2d at 621, citing Balson v. Dodds
(1980), 62 Ohio St.2d 287, 405 N.E.2d 293.
[56] See Universal Window Doors, Inc. v. Eagle Window Door, Inc. (1996), 116 Ohio App.3d 692, 699, 689 N.E.2d 56, 60, fn. 3; Air ProductsChemical, Inc. v. Indiana Ins. Co. (Dec. 23, 1999), Hamilton App. Nos. C-980947 and C-990009, unreported.
[57] (Dec. 10, 1987), Cuyahoga App. No. 52353, unreported.
[58] See Kokitka v. Ford Motor Co. (1995), 73 Ohio St.3d 89, 93,652 N.E.2d 671, 674-675.
[59] See Pang v. Minch (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph two of the syllabus.
[60] See Coffey v. Shenk (1974), 39 Ohio App.2d 156, 160,316 N.E.2d 917, 920.
[61] See Brokamp v. Mercy Hospital Anderson, supra, at 868,726 N.E.2d at 607.
[62] See Pang v. Minch, supra, at paragraph three of the syllabus.
[63] Brokamp v. Mercy Hospital Anderson, supra.
[64] Plaintiffs' counsel maintain that they had raised an objection to the forms at an in-chambers conference with no court reporter present, but there is no record of that conference.
[65] While counsel did alert the trial court that he "always make[s] a general objection * * * I have nothing more to say," this commentary was not sufficient to constitute an appropriate objection.
[66] See Goldfuss v. Davidson, supra.
[67] See State ex rel. Fowler v. Smith (1994), 68 Ohio St.3d 358, 359,626 N.E.2d 950, 952, citing Center Ridge Ganley, Inc. v. Stinn (1987),31 Ohio St.3d 310, 313, 511 N.E.2d 106, 109.
[68] See Rohde v. Farmer, supra, at 90, 262 N.E.2d at 690.
[69] See Posin v. A.B.C. Motor Court Hotel (1970), 45 Ohio St.2d 271,275, 344 N.E.2d 334, 338
[70] See Chemical Bank of N Y v. Neman (1990), 52 Ohio St.3d 204,207, 556 N.E.2d 490, 493-494.
[71] See Posin v. A.B.C. Motor Court Hotel, supra.
[72] See Posin v. A.B.C. Motor Court Hotel, supra.
[73] See id.
[74] See Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, 131-132,346 N.E.2d 673, 677-678.
[75] See Bruni v. Tatsumi, supra, at 130, 346 N.E.2d at 676-677.
[76] See Nickell v. Gonzalez (1985), 17 Ohio St.3d 136,477 N.E.2d 1145, syllabus.
[77] See Ratcliffe v. University Hospitals of Cleveland (Mar. 11, 1993), Cuyahoga App. No. 61791, unreported.
[78] While the cross-appellants include Ruth Siuda and Lora Maxwell (both of whom lost on the issue of informed consent) in their analysis, they never filed a cross-appeal; therefore, we cannot now consider the assignment of error to apply to them.
[79] See Brokamp v. Mercy Hosp. Anderson, supra, at 874,726 N.E.2d at 611.
[80] See Pang v. Minch, supra, at paragraph three of the syllabus.