DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 INTRODUCTION {¶ 1} The City of Green appropriated a strip of land from James and Zana Genovese so it could widen a road from two to five lanes. The project affected a mobile home park and marina the Genoveses operated on their land and also allegedly reduced the value of two mostly unused parcels that they intended to sell for commercial development. After the Genoveses refused the City's purchase offer, it filed a petition for appropriation. A jury awarded the Genoveses $50,000 for their land, $11,320 for a temporary easement, $175,507 for damage to the residue of their property, and $3173 for a retaining wall easement. This Court *Page 2 
reverses because the Genoveses should have been allowed to present evidence that the marina's piers' increased susceptibility to ice flow damage after the taking reduced the fair market value of their property. Accordingly, they are entitled to a new trial.
 FACTS {¶ 2} Before the project, the Genoveses owned over 15 acres of land along the east side of the road, near the southern shore of a lake. On the southern part of their property, they operated a mobile home park. On the northern part, they operated a marina. Although the state owned a narrow strip of land between the lake and the marina, the Genoveses had a license to use the state's land for their marina's piers and boat ramp. The marina had over 100 docks along seven piers that extended into the lake. Because the marina and mobile home park did not use all of their land, the Genoveses allocated two one-acre parcels that abutted the road for future commercial development.
 {¶ 3} To widen the road, the City appropriated a 25-foot-wide strip of land along the western edge of the Genoveses' property. As a result, the Genoveses had to reconfigure the marina's parking lot, remove one of the marina's piers, construct a new boat ramp, move the marina's outdoor boat storage area, modify the mobile home park's driveway, and replace a sign, some trees, and several lights. Construction of the new boat ramp required the Genoveses to remove a second marina pier. To avoid losing any dock space from the project, the *Page 3 
Genoveses extended four of their remaining piers 25-feet further into the lake and added an additional set of fingers perpendicular to each of those piers. The project also affected the marketability of the Genoveses' unused parcels because the City has an ordinance requiring commercial properties to be at least one-acre in size and the taking had made the parcels smaller than that. A purchaser, therefore, would need to obtain a variance from the City before it could develop the parcels.
 {¶ 4} The project did not only involve widening the road next to the Genoveses' property, it also called for the replacement of two short county-owned bridges that crossed the lake north of the Genoveses' property. Because the City did not want traffic to bottleneck at the bridges, it entered into an agreement with the county for the county to widen the bridges at the same time the City widened the road. In the agreement, the City and county stated that they would share the costs of widening the road and bridges. Instead of widening the two existing bridges, however, the county replaced them with a single long bridge. It used land the City had appropriated from the Genoveses to construct one of the embankments for the new bridge.
 {¶ 5} The Genoveses' engineer opined that, in addition to having to reconfigure its layout, the project had created a new problem for the marina. He noted that, before the project, the marina's piers had not experienced damage from moving ice. Although the piers had been surrounded by ice during the winter months, they had not suffered damage because they did not protrude very far into *Page 4 
the lake and were protected from movement by the bridges' embankments. Because ice moves more freely on the lake farther from shore, however, the extension of four of the marina's piers 25-feet further into the lake had made those piers more susceptible to ice flow damage. The engineer also explained that the new bridge had more space between its shorelines. This increased the amount of ice that could flow under the bridge and greatly reduced the piers' protection from ice movement.
 {¶ 6} The engineer concluded that, not only were the piers more exposed to moving ice after the project, but that since they were 25-feet longer, it was "a probable reality" that they would suffer damage from moving ice. He noted that, if the piers were not removed from the water during the winter, they could be completely destroyed by ice movement. He, therefore, recommended taking the piers out of the lake each fall and returning them in the spring. The engineer opined that this new yearly expense was "caused by the intrusion of the new highway into the property and business of [the marina]."
 {¶ 7} The Genoveses' appraiser also opined that the marina's new layout was disadvantageous because it increased the piers' exposure to moving ice. The appraiser noted that, because excessive ice damage can put a marina out of business, the physical layout of a marina and harbor is "very important to the desirability of a particular location." Noting that the marina's operators would have to remove and reinstall the piers on an annual basis, he characterized the *Page 5 
corresponding loss in market value to the marina as "[u]ncurable permanent damage to the residue."
 {¶ 8} Before trial, the City moved in limine seeking to exclude evidence about potential ice flow damage to the piers. It argued that the increased risk of damage to the piers was from the county's construction of the new bridge, not its widening of the road. The City also noted that the Genoveses had not removed their piers from the lake during the two winters since the new bridge had been constructed. The Genoveses, on the other hand, argued that because the road and bridge projects had been submitted by the City and county together for federal funding purposes, they should be considered a joint project. The Genoveses also noted that one of the new bridge's embankments had been built on land taken from them by the City.
 {¶ 9} The trial court excluded the Genoveses' evidence about ice flow damage to the piers for three reasons. It concluded that the direct cause of the potential damage to the piers was the new bridge and the change it caused in the course of ice flow on the lake. It also concluded that, because the Genoveses only had a license to operate their marina on the state's property, they had not suffered a compensable taking. Finally, it concluded that any damage to the piers from moving ice was speculative.
 {¶ 10} The jury awarded the Genoveses $50,000 in compensation for the land the City had permanently taken, $11,320 in compensation for land the City *Page 6 
had temporarily taken to store its construction vehicles, $175,507 in damages for the reduced value of the residue of the Genoveses' property after the project, and $3173 in compensation for a retaining wall easement. The Genoveses have appealed, assigning eight errors.
 TAKING OF PRIVATE PROPERTY {¶ 11} "The United States and Ohio Constitutions guarantee that private property shall not be taken for public use without just compensation." State ex rel. Shemo v. Mayfield Hts., 95 Ohio St. 3d 59,63 (2002). "Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken." United States v. Miller, 317 U.S. 369, 373 (1943).
 {¶ 12} "The test of just compensation . . . is the `fair market value' of the property." Masheter v. Brewer, 40 Ohio St. 2d 31, 33 (1974) (quoting Masheter v. Hoffman, 34 Ohio St. 2d 213, 221 (1973)). "The fair market value of property is the price on which a willing seller and a willing buyer would settle in a voluntary sale." Cincinnati v.Banks, 143 Ohio App. 3d 272, 279 (2001). "[W]hen only a part of a landowner's property is taken by the state for highway purposes, the constitutional requirement of just compensation means that compensation must be given for damages to the remainder as well as for the part taken." Fleming v. Noble, 111 Ohio App. 289, 292 (1959). "[T]he owner is entitled to a remedy consisting of two elements — `compensation' for the property actually taken and *Page 7 
`damages' for injury to the property which remains after the taking, i.e., the residue." City of Norwood v. Forest Converting Co.,16 Ohio App. 3d 411, 415 (1984).
 {¶ 13} "The rule of valuation in a land appropriation proceeding is not what the property is worth for any particular use but what it is worth generally for any and all uses for which it might be suitable, including the most valuable uses to which it can reasonably and practically be adapted." Sowers v. Schaeffer, 155 Ohio St. 454, paragraph three of the syllabus (1951). "The after value is always determined by an appraisal of the market value of what remains, or what will remain, after the improvement has been completed. This appraisal will always reflect the actual conditions then existing, although in some situations . . . it must be adjusted to exclude the impact of noncompensable attributes of value." In re Appropriation for Hwy.Purposes of Lands of Arnold, 23 Ohio App. 2d 56, 71 (1970). "In determining the amount of compensation, or the market value of the property taken, each case must be considered in the light of its own facts, and every element that can fairly enter into the question of value, and which an ordinarily prudent business man would consider before forming judgment in making a purchase, should be considered."Sowers, 155 Ohio St. at 459 (quoting 29 C.J.S. Eminent Domain § 136 (1941)).
 {¶ 14} "Where damage is caused to the residue of property remaining after a taking,`[if], by the expenditure of money in an amount less than the difference *Page 8 
between the before-and-after fair market value of the residue, the property owner could make improvements to such residue to restore the fair market value of the residue to that which it was before the improvement, then, evidence of such cost of cure would be admissible and, if proved, would limit the amount of damages to be assessed.'"Wray v. Stvartak, 121 Ohio App. 3d 462, 478 (1997) (quoting Columbus v.Farm Bur. Co-op. Assoc. Inc., 27 Ohio App. 2d 197, 203 (1971)). Although the "cost of cure" cannot be utilized to increase damages to the residue, it may be utilized to reduce those damages. Id
 STANDARD OF REVIEW {¶ 15} "On appeal from the final judgment in a proceeding to appropriate private property for public use, the controlling question for determination is whether the landowner, in a fair trial, received just compensation for his property actually taken and whether the damages to his remaining adjacent land were fairly assessed." OhioTurnpike Comm'n v. Ellis, 164 Ohio St. 377, paragraph one of the syllabus (1955). "In such a proceeding, the admission and exclusion of evidence as to the value of the land and other related subjects rests to large extent in the discretion of the trial court, and, where it is apparent that such court did not abuse its discretion in these respects and that no prejudicial error has intervened, a reviewing court will not interfere." Id. at paragraph two of the syllabus. If a trial court's order is based on a misconstruction of law, however, "an abuse-of-discretion standard is not appropriate; in determining questions of law, an *Page 9 
appellate court may properly substitute its judgment for that of the trial court." Swartzentruber v. Orrville Grace Brethren Church,163 Ohio App. 3d 96, 2005-Ohio-4264, at ¶ 6.
 ICE FLOW DAMAGE TO MARINA'S PIERS {¶ 16} The Genoveses' first assignment of error is that the trial court should have allowed them to present evidence that the project reduced the fair market value of their marina because they need to take its piers out of the lake each fall to prevent damage to them from moving ice. Regarding the trial court's first reason for excluding this evidence, the Genoveses have argued that, even if the increased risk of damage to the piers is because of the county's construction of the new bridge, they should still be allowed to recover from the City for the reduced market value of their property. The Genoveses cannot recover from the county directly because they only have a license to place their piers in the lake, and a license creates no interest in land. SeeOhio Valley Adver. Corp. v. Linzell, 107 Ohio App. 351, 355 (1957) (concluding a licensee could not recover in an appropriations action because it had no interest in the land).
 {¶ 17} In In re Appropriation for Hwy. Purposes of Lands ofArnold, 23 Ohio App. 2d 56, 60 (1970), a landowner owned a triangular parcel of land that was bordered by a state highway and two county roads. When the state decided to improve the highway to meet federal standards, it appropriated a piece of the landowner's property so it could construct an overpass for one of the county roads. *Page 10 Id. at 62. At the same time as the state constructed the overpass, the county vacated its other road where that road intersected the highway.Id. at 61.
 {¶ 18} Although the landowner had a right of direct access to the county roads, the court noted that a predecessor in title had conveyed away his right of direct access to the highway. Accordingly, the landowner only had a privilege of indirect access to the highway via the county roads. Id. at 65. Because the landowner did not have a right of direct access to the highway, he could not recover from the county for vacating its road where that road intersected the highway. Id. at 65-66.
 {¶ 19} The court noted that the goal of the project was to conform the highway to federal interstate standards by eliminating at grade crossings. Id. at 69. There were at least nine alternatives regarding the two county roads. Id. To achieve the federal standards, the state's plans, and the public's interests, however, it "was not possible to do anything [to one county road] intersection without also doing something to the [other county road] intersection, or vice versa." Id. The project involved vacating one road as much as it involved overpassing the other road, and, although the "piece of land taken was physically taken to provide additional right of way for [the overpass], it was also taken to make it possible to vacate [the other county road] and to bring [the highway] up to interstate standards." Id. The court, therefore, concluded that, although the landowner had no right to recover from the county for vacating its road, "he was entitled in the *Page 11 
appropriation appeal to have the vacation [of the county road] considered as part of the improvement . . . for which the appropriation was authorized in otherwise determining his right to, and the measure of, compensation." Id. at 69-70. The landowner's privilege of accessing the state highway via the county roads could be considered in assessing the market value of his property before the taking. Id. at 70.
 {¶ 20} The Genoveses proffered a resolution by the City indicating that it was in the public interest to reconstruct and widen the road north and south of the Genoveses' property and that the reconstruction project would require the replacement of the county's bridges. The resolution authorized the City's mayor to enter into an agreement with the county to share the costs of reconstructing the road and designated the road widening as phase one and the new bridge construction as phase two. The resolution further indicated that the parties would share the cost of both phases. The Genoveses also proffered an agreement of cooperation between the City and the county indicating that they would share the costs of widening the road and replacing the bridges.
 {¶ 21} The documents proffered by the Genoveses establish that the construction of the new bridge was a necessary part of the City's road widening project. If the county had not replaced the old bridges at the same time the City widened the road, traffic would bottleneck at the bridges. In addition, the county used part of the land the City appropriated from the Genoveses to construct one of *Page 12 
the new bridge's embankments. This Court, therefore, concludes that the Genoveses may recover from the City for any decrease in the market value of their property that is attributable to the county's construction of the new bridge. The piers' protection from ice movement by the bridges' embankments is an element that the trial court should have allowed the jury to consider in determining the before market value of the Genoveses' marina and in calculating the damage to the residue of their property. See Arnold, 23 Ohio App. 2d at 70 (explaining that landowner's privilege of accessing the state highway via the vacated county road was "an element entering fairly and directly into the question of market value . . . of Arnold's property as of the time of the take ") The jury, however, should also be allowed to consider the county's right, before the project, to have constructed a new bridge without taking any of the Genoveses' property. See City of Columbus v. Farm Bureau Co-op.Ass'n, 27 Ohio App. 2d 197, 202 (1971); Arnold,23 Ohio App. 2d at 70-72.
 {¶ 22} Regarding the trial court's second reason for excluding the Genoveses' ice flow damage evidence, it is immaterial that the Genoveses only have a license to use the state's land for their marina. There was no dispute that the Genoveses could recover for the cost of replacing their lost dock space and boat ramp, both of which were on state-owned property. The Genoveses are entitled to recover for anything that affects the fair market value of their property. "[Consequential damages which would be damnum absque injuria in the absence *Page 13 
of a taking, may be compensable damages to the residue in the event of a taking of a portion of an owner's property." City of Columbus v. FarmBureau Co-op. Ass'n, 27 Ohio App. 2d 197, 202 (1971). The potential for damage to the piers is a factor that "an ordinarily prudent business man would consider" before deciding whether to purchase the marina.Sowers v. Schaeffer, 155 Ohio St. 454, 459 (1951) (quoting 29 C.J.S. Eminent Domain § 136 (1941)). Accordingly, the trial court erred when it concluded that the Genoveses could not present evidence on the potential for ice flow damage to the piers because they only had a license for the lake.
 {¶ 23} Furthermore, regarding the trial court's third reason for excluding the ice flow damage evidence, the potential for damage to the market value of the Genoveses' marina was not speculative. The relevant question was not whether ice flow damage to the piers will happen, but whether a buyer would offer less for the marina because of the potential of ice flow damage to them. The Genoveses' appraiser stated that the marina's new configuration was disadvantageous because of the piers' increased exposure to moving ice. The appraiser noted that the physical layout of a marina and harbor is "very important to the desirability of a particular location" and that excessive ice damage can put a marina out of business. He, therefore, concluded that the change in the marina's layout had caused incurable permanent damage to its value. Accordingly, because the trial court focused only on whether ice flow damage would happen rather than *Page 14 
whether the market value of the Genoveses' property would be affected by the increased potential for damage, this Court concludes that it improperly excluded the Genoveses' evidence as speculative. The Genoveses' first assignment of error is sustained.
 {¶ 24} Because reversal on this ground requires the reappraisal of the before and after market value of the Genoveses' property, a new trial must be held on the amount of both the Genoveses' compensation and damages. The Genoveses' remaining assignments of error, therefore, are moot, and they are overruled on that basis. See App. R. 12(A)(1)(c).
 CONCLUSION {¶ 25} The Genoveses were entitled to present evidence at trial that the widening of the road and construction of the new bridge increased the likelihood that their marina's piers would experience damage from moving ice if they were not taken out of the lake during the winter, and that this new yearly expense reduced the fair market value of their property. The judgment of the trial court is reversed and this matter is remanded for a new trial.
Judgment reversed, and cause remanded.
 The Court finds that there were reasonable grounds for this appeal. *Page 15 
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to appellee.
 SLABY, P. J., MOORE, J., CONCUR *Page 1